## CULKIN et al. v. GLENN L. MARTIN NEBRASKA CO.

### Civ. 594.

United States District Court
D. Nebraska, Omaha Division.
April 30, 1951.

Emmet L. Murphy, Omaha, Neb., for plaintiffs.

George L. DeLacy and Leo Eisenstatt, of Kennedy, Holland, DeLacy & Svoboda, Omaha, Neb., Donald Leach, Columbus, Ohio, for defendant.

DONOHOE, Chief Judge.

The plaintiffs, Wren L. Culkin, Glen West, Francis H. Masker and Alex Feilmeyer brought this action against the Glenn L. Martin Nebraska Company,[1] a corporation, on behalf of themselves and others similarly situated, to recover compensation for overtime under the provisions of the Fair Labor Standards Act of 1938 as amended[2]. The defendant asserts that as to the claims of all the parties, other than the four individuals named above, the statute of limitations is a bar because, as to them, the action was not *commenced* within the time allowed[3]. In this connection the court's attention is called to Section 8 of the Portal to Portal Act, which provides that the statute of limitations shall also be applicable (in the case of a collective or representative action commenced prior to May 14, 1947, under the Fair Labor Standards Act) to an individual claimant who has not been specifically named as a party

1. Hereinafter the defendant is often referred to as the Martin Company.

2. 29 U.S.C.A. §§ 201 et seq., 252 et seq.

3. 29 U.S.C.A. § 255. Statute of Limitations.

 "Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act—

 \* \* \* \* \* \*

 "(b) if the cause of action accrued prior to May 14, 1947—may be com-
menced within whichever of the following periods is the shorter: (1) two years after the cause of action accrued, or (2) the period prescribed by the applicable State statute of limitations; and, except as provided in paragraph (c), every action shall be forever barred unless commenced within the shorter of such two periods;

 "(c) if the cause of action accrued prior to May 14, 1947, the action shall not be barred by paragraph (b) if it is commenced within one hundred and twenty days after May 14, 1947 unless at the time commenced it is barred by an applicable State statute of limitations."

plaintiff to the action prior to the expiration of one hundred and twenty days after May 14, 1947. In the application of such statute of limitations such action shall be considered to have been commenced as to him when, and only when, his written consent to become a party plaintiff to the action is filed in the court in which the action was brought, 29 U.S.C.A. § 257. Since no written consents were filed [4] the only question is whether all the parties seeking recovery were specifically named as parties plaintiff when the complaint and amended complaints were filed. If they were, the action has been commenced as to them within the time allowed by the Statute of Limitations.[5]

It is true that only four individuals were named in the caption and introductory paragraph of the complaint. However, the complaint clearly asserts that these four individuals—" * * * have been duly appointed and designated as agents or representatives, in writing, to maintain this action for and in behalf of all employees similarly situated and *particularly the employees named in the schedules attached* to the original Complaint, marked Exhibit 'A', and Exhibit 'B', attached hereto, are made a part of the Amendment to the Complaint as fully as if set forth and incorporated herein." These schedules marked Exhibit "A" and Exhibit "B" set forth the names of the various employees and the compensation claimed by each; consequently, the court has concluded that all of the employees specifically named in these schedules were named as parties plaintiff within

the meaning of Section 8 of the Portal to Portal Act. Gibbons v. Equitable Life Assurance Society of United States, 2 Cir., 1948, 173 F.2d 337.

Since the right of the plaintiff to recover and many defenses of the defendant are dependent upon the determination of certain factual issues [6] the court has carefully examined the material evidence adduced at the trial and hereby makes the following special

### Findings of Fact:

Sometime prior to January, 1942, the United States Government erected an airplane assembly and modification plant on a military reservation, known as Fort Crook, Nebraska, which is situated approximately ten miles south of the city of Omaha, Nebraska. The entire plant area, comprising nearly seven hundred acres, was at all times material to this action, owned by the United States, as were the plant buildings and all equipment, machinery and tools used therein.

Beginning in 1941, the Government [7] entered into a series of contracts with the defendant Martin Company pertaining to the operation of the beforementioned plant and the assembly and modification therein of certain military aircraft. There were in all four main contracts. The first contract [8] executed June 28, 1941, provided for the assembly by the Martin Company of twelve hundred medium bombers, Type B-26, on a cost-plus-a-fixed fee basis. The second contract,[9] executed November 6, 1942, covered the modification by the defendant company of various types of Al-

4. This does not mean to imply that the four individuals named in the caption of the complaint had not in fact been authorized by the employees to bring suit in their behalf. On the contrary, the plaintiffs introduced in evidence, at the trial, written authorizations signed by each employee on whose behalf a claim is being made.

Exhibit 32.

5. The complaint was filed February 6, 1945. This complaint and all amendments thereto were filed prior to the expiration of 120 days after May 14, 1947. No one contends that the Nebras-

ka Statute of Limitations is a bar to the action.

6. Even the application of Section 2 of the Portal Act, 29 U.S.C.A. § 252, which the defendant contends deprives this court of jurisdiction, depends in some degree upon questions of fact.

7. As used in this opinion this term refers to the United States Government or any agent or instrumentality authorized to act on behalf of the United States Government.

8. Exhibit 1.

9. Exhibit 4.

lied airplanes on a cost-plus-a-fixed fee basis. The third contract,[10] executed July 20, 1943, related to the assembly of one thousand additional medium bombers, Type B-26 on a straight fixed fee basis. Since this contract provided a basis for compensation to the defendant differing materially from the basis provided in the other three contracts, it may be well to mention that this contract was performed by the Martin Company during the period beginning in March, 1943, and ending late in the summer of 1944. The fourth contract,[11] executed June 30, 1944, covered the assembly of heavy bombers, Type B-29, on a cost-plus-a-fixed fee basis. This contract was terminated following the cessation of hostilities ending World War II, at which time five hundred and thirty-one B-29 "Super-fortresses" had been delivered to the Government by the defendant pursuant to the terms of this last contract.

As a general rule, the assembly contracts were carried out in the following manner: The Government would contract for construction of the component parts of the aircraft with various major subcontractors. For example, the Chrysler Corporation of Detroit, Michigan, would produce the fuselage of the plane, the Goodyear Aircraft Corporation of Akron, Ohio, would fashion the wings and the Hudson Motor Car Company of Detroit, Michigan, would construct the empennage. Certain special components known as "G F E", [12] such as engines, propellers, bombsights, instruments and armament, were furnished directly by the Government. All of the components mentioned above were paid for by the Government and ordinarily would be shipped to the Martin Company under Government bills of lading. A small portion of the materials used in the airplanes was purchased directly by the defendant company, and the company would in turn be reimbursed for the purchase price by the Government. The title to all materials purchased for use in the assembly of aircrafts, under the terms of the contracts, vested immediately upon purchase in the United States Government. After receiving the components, the Martin Company, constructing, itself, portions of the plane not otherwise provided for, would assemble the aircraft. Upon completion, the bomber would be delivered, at the place of its assembly, to the Government. The liability of the Government to pay for any particular plane did not become finally fixed, nor did the responsibility of the Martin Company for the proper construction of the plane terminate until it was accepted by the Government.[13]

The modification contract was carried out in a manner substantially similar to the assembly contracts with the obvious difference that under the modification contracts the defendant merely effected changes or alterations in aircrafts as distinguished from completely assembling the same.

All of the planes delivered by the defendant to the Government, under the terms of the contracts mentioned above, were used by the Government in the prosecution of World War II and were flown by the Government to various points outside the state of Nebraska.

During the initial operation of the Bomber Plant at Fort Crook, Nebraska, the Government loaned large sums of money to the Martin Company in the following manner: The Government established certain funds which the Company was authorized to draw upon for the purpose of paying the costs of operation. As the funds were depleted the Government would replenish them, so that the Company would always have sufficient capital available to meet the costs of operation as such came due. As the costs were paid by the Company, they would be checked by Government auditors retained at the plant, and the amount of the costs approved as proper under the contracts, would be credited against the previous advances

10. Exhibit 2.

11. Exhibit 3.

12. Government furnished equipment.

13. This description of the performance of the contracts is not adequate in detail, but it sufficiently reflects what is contained in the evidence for all purposes necessary to the determination of this case.

which the Government had made to the Martin Company.

In order to carry out the contracts with the Government, the Martin Company, through its personnel and employment offices, hired a great many employees, including the present plaintiffs in this action. As a security precaution, all employees were hired subject to the approval of the Government. These employees, who were used in the performance of the Government contracts, were paid by checks issued by the Martin Company; they were subject to the Nebraska Workmen's Compensation Laws; they received benefits (sick leave, vacation pay, etc.) differing materially from the usual benefits received by Government employees; and finally, they were under the direct control and supervision of the Martin Company.

All of the plaintiffs involved in this action were members of the Company's protective force stationed at the Bomber Plant. This force which consisted of guards and firemen, had the duty, generally, to preserve order, prevent espionage and sabotage, guard against and extinguish fires and to take any action reasonably necessary to the preservation of the plant, the protection of the employees and the prevention of subversive acts. The entire plant area was enclosed in a strong wire fence and the protective force maintained vigilance over this area on a three-shift, twenty-four hour a day, basis. Prior to March 6, 1943, the shift periods for guards and firemen at the defendant's plant were as follows:

January, 1942, until May 4, 1942.

| Shift | Time | | |
|-------|------|---|---|
| 1st Shift | 8:00 A.M. | to | 4:00 P.M. |
| 2nd Shift | 4:00 P.M. | to | 12:00 Midnight |
| 3rd Shift | 12:00 Midnight | to | 8:00 A.M. |

May 4, 1942, until March 6, 1943.

| Shift | Time | | |
|-------|------|---|---|
| 1st Shift | 7:00 A.M. | to | 3:00 P.M. |
| 2nd Shift | 3:00 P.M. | to | 11:00 P.M. |
| 3rd Shift | 11:00 P.M. | to | 7:00 P.M.[14] |

It was the custom and practice prior to March 6, 1943, to compensate the protective force on the basis of an eight-hour day. This meant that a guard employed on the first shift between May 4, 1942, and March 6, 1943, would be required to check in not later than 7:00 A.M., and check out not

earlier than 3:00 P.M. He would bring his lunch and was required to eat it at or near his post. He would not lose any pay for the lunch period; consequently, all guards and firemen received pay for the full eight hours of the shift period prior to March 6, 1943.

On March 3, 1943, an order was issued by the defendant company directed to "All Guards", which reads as follows:

"Effective Saturday, March 6, the Guards on the first shift will ring in by 6:45 A.M. and ring out after 3:15 P.M. This will mean that the Guards will have 8½ hours on the clock. This should be ample time to get your uniforms changed and receive orders and be on the post at 7:00 A.M.

"Guards will not be allowed to eat on their posts. They will be allowed thirty (30) minutes for lunch. The Rover in this case when on relief will check the Guard out and in during the lunch period. The Guards will be allowed to eat in the Cafeteria during the lunch period.

"The Guards on the second shift will ring in by 2:45 P.M. and ring out after 11:15 P.M. and will follow the instructions as given in the first paragraph, and the second paragraph.

"The Guards on the third shift will ring in by 10:45 P.M. and ring out after 7:15 A.M. and will follow the instructions as given in the first paragraph, and the second paragraph.

"This pertains to all three Companies."[15] This order did not expressly refer to firemen. However, after March 6, 1943, all guards and firemen were required to ring in and out for their respective shifts in accordance with the foregoing order. If they failed to do so, their pay would be "docked" accordingly. As a result of this procedure, the shift periods overlapped each other by one-half an hour, e. g. the second shift would begin at 2:45 P.M. which was thirty minutes prior to the end of the first shift at 3:15 P.M. This overlap allowed the oncoming shift fifteen minutes to take care of preliminary

14. Exhibit 36.

15. Exhibit 37.

matters (checking in, changing clothes, acquiring equipment, etc.) and the outgoing shift fifteen minutes to take care of postliminary matters, without leaving the plant unprotected for even a second during the changeover. Since adequate remuneration has been made for preliminary and postliminary activities, these activities do not serve as the basis of any claim in this lawsuit.

In connection with the new time schedule for shift periods, the Company issued a directive to the timekeeping department which provided that on and after March 6, 1943—

"All Guards will be allowed a thirty (30) minute lunch period. The lunch period is to be deducted from the time shown on the time cards.

"This will mean that all Guards will have 8½ hours shown on their time cards but will be credited with 8 hours only." [16] It is undisputed that from March 6, 1943, until September 17, 1944,[17] the timekeeping department followed the practice of deducting one-half hour each day from the time shown on the cards of both the guards and firemen. This deduction was made because theoretically at least, pursuant to the directives issued March 3, 1943, each member of the protective force could avail himself of a one-half hour lunch period. However, as will be seen later, all members of the protective force were required, during the lunch period, to engage in certain activities which were primarily for the benefit of the defendant. A more definite explanation of these activities is set forth in the following paragraphs.

### Guards

The primary function of a guard, irrespective of his particular station at the plant, involved constant vigilance for the security of the defendant's property. Each guard, however, had certain specific duties, routine in character, which were, in a sense at least, related to the individual post, e. g. the guards at the main gate were required to examine the credentials of all persons seeking admittance to the plant; the guard at the water tower was required to take a water reading every twenty minutes; and the guard on freight inspection duty was required to check incoming carloads of freight.

Because the defendant desired to have each post properly manned twenty-four hours a day, each guard was impressed with the obligation to remain at his post until it was otherwise adequately taken care of. It is obvious that if the complement of a particular post consisted of only a single guard, which is true of many posts,[18] one of two things would have to occur if the guard on that post were to avail himself of a lunch period: 1) the company would have to furnish relief; or 2) the post would have to be left unguarded. To foster the former and prevent the latter, the company attempted to establish a system whereby each guard could be relieved for lunch. Before considering this system in detail, it should be observed that several of the posts had a complement consisting of two or more guards; and that if one of the guards were to leave, the post might still be appropriately manned. Therefore, some guards could relieve themselves and relieve others for lunch.

The system was essentially this: Every day the Company would post a bulletin assigning each guard to a particular post

---

16. Exhibit 96.

17. Exhibit 38: To All Guards and Firemen.
"Effective with the second shift September 17, 1944 it will be required that all men eat their lunch on their post of duty, and not go to the cafeteria to eat lunch. No deduction shall be made thereafter for the usual lunch period."

18. As a general rule more than half of the posts had but a single guard.
Exhibits 106, 107, 108, 109, 111.

and assigning someone to relieve each guard for lunch at a certain time. For the purposes of clarity a representative bulletin has been set forth in the margin.[19] An examination of these bulletins shows that in many instances a guard would be directed to relieve himself; in other instances a guard would be required to relieve others; and in still other instances, "Rovers" were assigned to relieve guards for lunch. "Rovers" were guards whose only duty was to relieve other guards. However, the number of "Rovers" was exceedingly limited (seldom were more than 2 of the 43 guards on a shift assigned the duty of "Rovers"). Witnesses for the defendant testified that the system was satisfactory because where a particular guard was directed to relieve himself or others, there would be a sufficient number

[19] Exhibit 111, Sheet 3.

First Shift Daily Guard Posts May 26, 1944

Drill Master Ass't Chief Russell Capt. Jordon Traffic Detail
 Sgt. Rauscher Lt. Kechley

Lunch Reliefs Administration Building

| Lunch Reliefs | Post | Guard |
|---|---|---|
| Selves .....10:45 | East Gate ................ | Kraft—Barrett |
| Selves .....10:45 | West Gate ................ | Fahey—Weston—Albin—Milford |
| West Gate ..10:45 | Administration Gate ....... | Wilmeth |
| Self ........11:15 | Freight Car Inspection .... | Stewart |
| Goulet .....10:45 | A.D.T. Operator .......... | Swick |
| Self ........11:45 | Tower #1 ................ | Ramsbottom |
| Self ........10:45 | Tower #3 ................ | |
| Self ........10:45 | Tower #10 .............. | Iliff |
| Selves .....10:45 | Escort Service ............ | Hudson—Goulet |
| Selves .....10:45 | Traffic Detail ............ | Carpenter—Behm—Colgan—Hess (Ehlers until 9:00 A.M.) |
| Self ........10:45 | Special Investigator ....... | T. Brown |
| West Gate ..10:45 | Gate #1A ................ | Pruss |

Plant Downstairs

| Lunch Reliefs | Post | Guard |
|---|---|---|
| Self ........10:45 | Post #1 ................ | H. Brown—Venneman |
| Self ........10:45 | Post #2 ................ | |
| Self ........11:15 | Post #3 ................ | Clark |
| Self ........11:15 | Post #4 ................ | Nicol |
| Self ........10:45 | Post #5 ................ | Shigley |
| Self ........11:15 | Post #6 ................ | Stephens |
| Self ........10:45 | North Dock Rover ........ | Thomas |
| Self ........11:15 | Rover .................... | Mackey |

Plant Upstairs

| Lunch Reliefs | Post | Guard |
|---|---|---|
| Self ........10:45 | Post #7 ................ | Carter |
| Self ........11:15 | Post #8 ................ | Ehlers |
| Self ........10:45 | Post #9 ................ | Soss |
| Self ........11:15 | Post #10 ................ | Hall |
| Self ........10:45 | Rover ................... | Day |

Paint Shop

| Lunch Reliefs | Post | Guard |
|---|---|---|
| Self ........11:45 | Post 11 & 12 ............ | Yates |

Bus Gate ....7:45–8:45....Ramsbottom—H. Brown
Gate #2 .....7:45–8:45....Clark—Nicol
Gate #3 .....7:00–8:45....Shigley—Thomas—Venneman
Gate #5 .....7:45–8:30....Carter—Hall

Day Off: Sgt. Doyle—Cleghorn—Voyles—Bowye—Neely

Loaned to Dept. #15—Wachal #38–145
Loaned to Dept. #39—Rombough #38–203
Vacation: Sgt. Sprandel.

of guards left at his post to take care of it; or the post was one which could be left unguarded.

Though the court is inclined to believe that the foregoing system might, under proper conditions, be very workable, we are not at liberty to disregard the direct testimony of the plaintiffs to the effect that in many instances they were not in fact relieved and were under an obligation to remain at their post. The court points specifically to the testimony of Mr. Kerwin, who stated that he was not relieved, and that he was required to take water readings every twenty minutes. Obviously it would have been impossible for him to take a thirty-minute lunch period. The situation presented by Mr. Kerwin's testimony is not an isolated one. The testimony of all the witnesses has induced the court to find as a matter of fact that in many instances the guards were not relieved, but per contra, were required to remain at a particular post throughout the entire shift period.

As to those guards who were relieved, the following observations are important. It is established by the evidence that none of the defendant's employees could leave the fenced-in plant area during the lunch period. This was a necessary security measure which applied to the guards and firemen, as well as to all other employees. When the guards were relieved for lunch they could go either to the nearest cafeteria or to the smoking area. Regardless of where they went, they were on duty and were required to remain in full uniform. The evidence shows that they could not even remove their visored caps or sidearms while eating. If any disturbance arose, the guards were obligated to take the appropriate action even if it meant putting aside their lunch. In certain of the cafeterias there were signal lights which were used to contact the various members of the protective force and guards were, in a relatively few instances, required to leave their meal in response to calls. The guards testified that they were cautioned to watch for employees without badges and that on one or two occasions a guard did take action in that regard during his lunch period. Though the instances where a guard was required to take affirmative action were not relatively great, the court cannot lose sight of the fact that the mere presence of a guard fully uniformed, anywhere in the plant area, was a deterrent to lawlessness and necessarily beneficial to the defendant.

## Firemen

The firemen may be classified into three distinct groups The first group includes those firemen who were assigned to the station house; the second group, those who were assigned to the crash truck; and the third group, those who were assigned to make inspections in the main plant and the modification center.

The firemen assigned to the station house were required to eat their lunch at the station house. They were allowed to go, one at a time, to the cafeteria, which was approximately twenty-five feet from the station house, gather their lunch on a tray and then return to the station house to eat. These firemen were required to remain in full uniform and to be ready to answer any call during their lunch period in the same manner as during any other time of the day.

The firemen assigned to the crash truck were relieved of their duties on the crash truck during their lunch period. However, they were required to return to the station house and follow the same procedure for lunch and assume the same duties during the lunch period as the men stationed there.

The firemen assigned to make inspections were allowed to eat in the cafeteria nearest the place of inspection. These firemen carried plug-in telephones, which they were required to take with them to the cafeteria. In some of the cafeterias there were signal lights on the walls which the firemen had to observe during their lunch period. When a certain signal would flash, the firemen beckoned would plug in his phone and answer the call. These firemen were also required to remain in full uniform the same as the others, during the lunch period.

The evidence shows that at various times, some firemen in each of the three groups, were actually called upon to take affirmative action for the defendant's benefit during their lunch time. Though the instances in which such affirmative action was required are relatively few, it is nonetheless apparent that the firemen were required to be constantly vigilant and consequently, even during the lunch period, their time was not their own, but belonged to the company.

## Contract Custom and Practice

As will be seen at a later point in this memorandum both jurisdiction and the decision in this case are based upon the major premise that Section 2 of the Portal Act [20] is inapplicable to the situation now under consideration; consequently, the following findings of fact relating to contract, custom and practice are not made as a basis for the decision, but merely to provide adequate and full findings of fact on all the issues presented.

The plaintiffs have alleged that the activities engaged in during the lunch period were compensable throughout the period in question "under the general non-written contract in effect between defendant and each of said employees." The evidence, however, does not support this allegation; consequently, the court is unable to find that the activities were compensable by contract.

The plaintiffs have also alleged that the activities were compensable "under the universal custóm and practices in effect at said time, and for many years prior there-

to; and under the laws and practices in and throughout the state of Nebraska where said activities and duties were performed." There is a serious question as to whether this allegation is sufficient to meet the requirements of Section 2 of the Portal Act. Bonner v. Elizabeth Arden, Inc., 2 Cir., 1949, 177 F.2d 703. However, since this action was filed almost two years prior to the passage of the Portal Act, and since the particular allegation mentioned is an amendment prepared and filed within one month after the passage of the Act, the court is inclined to construe the pleading as satisfactory and deems it wise to consider the evidence relating to custom and practice. [21]

Prior to March 6, 1943, it was the custom in the plant being operated by the Martin Company to pay all the guards and firemen for their lunch period. On March 3, 1943, the Company issued the directives referred to before [22] in an effort to alter this custom. The defendant contends that this unilateral action was, per se, sufficient to change the custom; and further, that this action was accepted by the employees, thereby creating a contract inconsistent with the past custom. There is, of course, no evidence of express acceptance. The evidence of implied acceptance may be summarized as follows: The Company stopped paying for activities engaged in during the lunch period and the employees continued to work with the knowledge that they were not being paid for this time. The employees, individually, could have ceased working for the Martin Company [23] when these directives were issued, but they were subject to the regulations of

20. 29 U.S.C.A. § 252.
21. Rule 8(f), Federal Rules of Civil Procedure, 28 U.S.C.A., provides that all pleadings shall be so construed as to do substantial justice. A liberal construction seems to be in accordance with the basic purpose of this rule.
 The court calls attention to Rule 15(b) which allows, in certain situations, an amendment of a pleading to conform to the evidence.
22. Footnotes 15 and 16, supra.
23. Exhibit 113, page 12.
 "15. Notice of Quitting—
 The Company will give one day's no-

tice of lay-off unless such lay-off is required by unforeseen matters beyond the Company's control. This does not apply to discharge for cause.
 "Any hourly employee leaving the Company and expecting to receive his wages at the time of leaving is required to give three days' notice. If this procedure is not followed, delay may result in the issuance of the pay check.
 "Employees must work during the three day notice of quitting period in order to receive pay at the end of that period."

the War Manpower Board [24] and were under the compulsion of the times to continue in their employment because of the need for their contribution to the national war effort. Under these circumstances, the employees complained to their union officials, who in turn, complained to the defendant Company, and on September 17, 1944, the Company resumed the practice of paying the firemen and the guards for their lunch period. [25]

## Discussion

With these basic facts in mind, the court opines that the following discussion of authorities is apropos. In 1938, Congress, exercising its authority to regulate commerce, [26] enacted the Fair Labor Standards Act to eliminate certain labor conditions which were found to burden interstate commerce. The basic purposes of the Act are two-fold: 1) to stop employment at substandard rates of pay by establishing a floor under wages; and 2) to increase employment by increasing the cost of overtime, i. e. time worked in excess of forty hours a week. Overnight Motor Transportation Company, Inc., v. Missel, 316 U.S. 572, 62 S.Ct. 1216, 86 L.Ed. 1682; Walling v. Helmerich & Payne, Inc., 323 U.S. 37, 65 S.Ct. 11, 89 L.Ed. 29. The constitutionality of this Act is no longer open to question. United States v. Darby, 312 U.S. 100, 61 S.Ct. 451, 85 L.Ed. 609; Opp Cotton Mills, Inc., v. Administrator of Wage and Hour Division, 312 U.S. 126, 657, 61 S.Ct. 524, 85 L.Ed. 624; Oklahoma Press Publishing Company v. Walling, 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614; Mabee v. White Plains Publishing Company, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607.

Subject to certain exceptions, the provisions of the Fair Labor Standards Act are applicable to those employees who are engaged in commerce or in the production of goods for Commerce. [27] One of the exceptions, which incidentally was relied upon by the defendant throughout the trial, is that an employee of the United States is not covered by the Act. [28] In view of the evidence, however, the court has reached the inescapable conclusion that the employees involved in this litigation were not employees of the United States, but were employees of the Glenn L. Martin-Nebraska Company. Powell v. United States Cartridge Company, 339 U.S. 497, 70 S.Ct. 755, 94 L.Ed. 1017. It is also apparent that each and every one of these employees was, at all times material to this action, engaged in the production of goods for commerce within the meaning of the Fair Labor Standards Act. The transportation of airplanes of the United States to destinations outside of the State of their production is "commerce" within the meaning of the Act. 52 Stat. 1060, 29 U.S.C.A. § 203(b); Powell v. United States Cartridge Company, supra. The airplanes produced were "goods" within the meaning of the Act. 52 Stat. 1061, 29 U.S.C.A. § 203(i); Powell v. United States Cartridge Company, supra. Finally, the employees involved in this action were "engaged in the production" of these goods. Section 3(j) of the Act provides: " * * * an employee shall be deemed to

24. Executive Order No. 9328, 50 U.S.C. A.Appendix, § 901 note, contained in Fed.Reg. Vol. 8, No. 71, p. 4681, Exhibit 46.

25. Footnote 17, supra.
 This court would be reluctant, unless it is required as a matter of law, to hold that the unilateral action of the employer was impliedly accepted by the employees and that a new contract or custom was created whereby the employees agreed to work during their lunch period without pay. Indeed, such a conclusion would impose a penalty upon patriotism.

26. Art. I, Section 8, U.S.Const.

27. Section 6(a) and Section 7(a) of the Fair Labor Standards Act. 52 Stat. 1062, 1063, 29 U.S.C.A. §§ 206(a) and 207(a).

28. "Sec. 3. As used in this Act—
 * * * * * *
 "(d) 'Employer' includes any person acting directly or indirectly in the interest of an employer in relation to an employee but shall not include the United States or any State or political subdivision of a State * * *.
 "(e) 'Employee' includes any individual employed by an employer." 52 Stat. 1060, 29 U.S.C.A. § 203(d) and (e).

672

have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or *in any process or occupation necessary to the production thereof*, in any State." [29] (Emphasis added.) That the guards and firemen employed by the defendant in this case were engaged in an occupation necessary to the production of the bombers is apparent. Armour and Company v. Wantock, 323 U.S. 126, 65 S.Ct. 165, 89 L.Ed. 118; Skidmore v. Swift & Co., 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124; Walton v. Southern Package Corporation, 320 U.S. 540, 64 S.Ct. 320, 88 L.Ed. 298; Mid-Continent Pipe Line Company v. Hargrave, 10 Cir., 1942, 129 F.2d 655.

 Under the Fair Labor Standards Act an employer is required to pay all his employees who are covered by the Act a regular hourly rate of pay which is at least equal to the statutory minimum [30] and in addition to this is required to pay each covered employee one and one-half times his regular rate of pay for all hours which he works in excess of forty hours during the workweek.[31] The two basic factual issues involved in every wage and hour case are: 1) the regular rate of pay; and 2) the number of hours worked. These factual issues must be resolved in regard to each particular employee during each workweek in question. Overnight Motor Transportation Company v. Missel, supra. The solution of the first issue is elementary in this case because the regular rate of pay has been set on an hourly basis [32] and since it exceeds the statutory minimum no one has been aggrieved on that score.[33] The sole remaining issue, then, is the question of "hours worked"; and, this issue, though not resolved, has been considerably limited. The court is called upon to decide whether the one-half hour period, loosely referred to as the "lunch period", constituted "hours worked" within the meaning of the Fair Labor Standards Act.

### Hours Worked

 Work has been defined, for the purposes of the Fair Labor Standards Act, as meaning physical or mental exertion whether burdensome or not-controlled or required by the employer and pursued primarily for the benefit of the employer and his business. Tennessee Coal, Iron and Railroad Company v. Muscoda Local 123, 321 U.S. 590, 64 S.Ct. 698, 88 L.Ed. 949. It is beyond question that the guards and firemen, who were not adequately relieved for their lunch period, and who remained at their regular post during this period, engaged in the same activities in in which they were engaged throughout the rest of the day, were "working", within the meaning of the Fair Labor Standards Act. No clearer case of "hours worked" could be presented.

The definition of "hours worked" has not been limited to encompass only those situations in which an employee is engaged in affirmative action. Mr. Justice Jackson, speaking for the United States Supreme Court, in Armour & Co., v. Wantock, supra [323 U.S. 126, 65 S.Ct. 168], points out: "Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case." The employees

29. 29 U.S.C.A. § 203(j).

30. 29 U.S.C.A. § 206.

31. 29 U.S.C.A. § 207.

32. The parties have stipulated that the wages of all the employees involved in this suit varied during the time in question from 60 cents to 92½ cents an hour.

33. The statutory minimum in effect during the time in question was 40 cents an hour. 29 U.S.C.A. § 206.

involved in the present case were not waiting to be engaged; they had been engaged to wait. The defendant contends, however, that even though the employees were "on call" during the lunch period that the employees did not spend the time during this period predominantly for the benefit of the employer. In this connection he refers the court's attention to Justice Jackson's statement in Skidmore v. Swift & Co., supra: " * * * although the employees were required to remain on the premises during the entire time, *the evidence* shows that they were very rarely interrupted in their normal sleeping and eating time, and these are pursuits of a purely private nature which would presumably occupy the employees' time whether they were on duty or not and *which apparently could be pursued adequately and comfortably in the required circumstances*". 323 U.S. 139, 65 S.Ct. 164.

The Supreme Court cautioned in this very case that words of the court's opinions are to be read in the light of the facts of the case under discussion. What was shown by the evidence in Skidmore v. Swift & Co., supra, is not shown by the evidence in this case. There are two basic factual differences: 1) the guards and firemen in the present case could not adequately and comfortably pursue their meal in the required circumstances; and 2) in many situations the guards and firemen were not merely "on call" but were actually on duty. All the members of the protective force were required to be in full uniform during the lunch period. The significance of this fact can best be made apparent by a simple illustration. A particular guard might be assigned to post number one in the main assembly plant. This post covered a particular area of the plant which the guard would be required to patrol. Constant surveillance of the employees was a necessary precaution. When the lunch hour arrived, the employees in this area could leave their work and go to the nearest cafeteria for lunch. Because this created a slack period,

the guard would relieve himself, and he too could go to the nearest cafeteria for lunch.[34] However, the guard could not take off his visor cap, insignia or sidearms while eating. He had to consider himself on duty and was required to take any affirmative action which might be necessary during this lunch period. The court cannot fail to recognize that the mere presence of the guard, fully uniformed, in the cafeteria, was in itself a deterrent to lawlessness and disorder and consequently very beneficial to the defendant company, even if the guard did not perform any affirmative act.

The defendant company not only accepted the usefulness of the protective force during the lunch period, but it imposed restrictions which would guarantee the same. The restrictions (requiring the employees to eat in certain areas, to remain in full uniform, to be constantly vigilant for signals and calls, to check for badge infractions, to prevent disturbances, etc.) deprived the employees of that degree of freedom during the lunch period which would have enabled them to adequately and comfortably enjoy the time as their own. This conclusion seems neither unwarranted nor unusual. Cf. Biggs v. Joshua Hendy Corp., 9 Cir., 1950, 183 F.2d 515; United States v. Ewald Iron Company, D.C.W.D.Ky. 1946, 67 F.Supp. 67; Donza v. Mercantile Ship Repair, New York City Court 1946, 104 N.Y.S.2d 654; Walling v. Dunbar Transfer & Storage Co., Inc., D.C.Tenn. 1943.*

### Portal to Portal Act

█ The defendant contends that, even though the activities engaged in by the guards and firemen during their lunch period may constitute "hours work" under the Fair Labor Standards Act, no liability may be imposed upon the defendant unless these activities were compensable by contract, custom or practice. In this regard the defendant relies upon Section 2

---

34. The testimony indicates that the guards could go only one of two places for their lunch, if they did not eat at their post:

1) The nearest cafeteria; and 2) the smoking area.

* No opinion for publication.

of the Portal Act.[35] Counsel for the plaintiff, on the other hand, strenuously urges that, since the activities engaged in during the lunch period were part of the days principal activities and not preliminary or postliminary in character, Section 2 of the Portal to Portal Act does not apply. Though there is some authority to the contrary in other circuits,[36] the view adopted in our own circuit seems to be in accordance with that suggested by counsel for the plaintiffs. In Central Missouri Telephone Company v. Conwell, 8 Cir., 1948, 170 F.2d 641, 645, Judge Gardner, speaking for an unanimous court, announced:

"In the instant case there is no claim seeking to recover for time consumed in walking to work or other activities either before or after the normal working hours. Here the claim is that these employees actually worked many hours in excess of the forty hours permitted by the Fair Labor Standards Act, not for activities of a Portal-to-Portal nature, such as were involved in Anderson v. Mt. Clemens Pottery Company, supra [328 U.S. 680, 66 S.Ct. 1187, 90 L.Ed. 1515], and we agree with the trial court that it was not the purpose of the Portal Act to destroy such claims.

"Section 207 of the Fair Labor Standards Act provides that,

"'No employer shall, except as otherwise provided in this section, employ any of his employees who is engaged in commerce or in the production of goods for commerce * * * for a workweek longer than forty hours * * *, unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.'

"We are of the view that this provision of the Fair Labor Standards Act was neither repealed nor so modified as to make it necessary to plead, in an action to recover compensation for time actually devoted to the normal work for which the employee was employed, an express written contract or unwritten contract, or a practice or custom."

This view, that Section 2 of the Portal Act is directed against claims for compensation for activities such as dressing for work, traveling within the plant to job location, etc., which are different from the activities which comprise the regular normal part of employment and that the section has no application where the work for which compensation is being claimed is the same kind of work as was performed throughout the remainder of the workweek, has also been accepted by courts in other circuits. Biggs v. Joshua Hendy Corporation, 9 Cir., 1950, 183 F.2d 515; Knudsen v. Lee & Simmons, Inc., D.C. N.Y.1949, 89 F.Supp. 400.

The court's attention has been directed to the statement of Judge Collet, writing in the more recent decision in United States Cartridge Company v. Powell, 8 Cir., 1950, 185 F.2d 67, 71: "Since the time claimed before the beginning of the regular shifts and the 30-minute lunch periods are of the character which the Portal-to-Portal Act requires that there should be a contract expressly providing compensation for, or a custom or practice consistent with an intention that there be compensation for such time and not inconsistent with an existing contract, before compensation may be recovered for such time, a formal compliance with the requirement of the Act would require that the conditions precedent to recovery, specified in the Act, be pleaded." This court does not understand the foregoing statement, read in its context and limited to the facts involved in the Powell case, to mean that time claimed for lunch periods is, in every situation, Portal-to-Portal in character. Whether the time is Portal-to-Portal time depends upon the nature of the activity engaged in during the period in question; and not upon the term by which the period is known. The evidence in this case clearly establishes as a matter of fact that during the "lunch periods" in question, the employees were en-

35. 29 U.S.C.A. § 252.

36. Seese v. Bethlehem Steel Co., D.C.Md., 74 F.Supp. 412; Welsh v. W. J. Dillner Transfer Co., D.C.Pa.1950, 91 F.Supp.

685; Amelbo v. Pennsylvania Salt Manufacturing Company, D.C.Penn., 1949, 83 F.Supp. 456; Shaievitz v. Laks, D.C. N.Y.1948, 80 F.Supp. 241.

gaged in the principal activity of the work-week and were not merely taking care of preliminary or postliminary matters. This being so, the court has concluded that Section 2 of the Portal Act is inapplicable to this case and that the plaintiffs are not required to plead and prove a contract, custom or practice to compensate them for the hours worked during the lunch period. Biggs v. Joshua Hendy Corp., supra.

The one-half hour lunch period involved in this case was not such as to be negligible and consequently it does not come within the de minimis principle. As the Supreme Court announced in the Mount Clemens Pottery case, 328 U.S. 680, 692, 66 S.Ct. 1187, 90 L.Ed. 1515, where the employee is required to give up a substantial measure of his time and effort, compensable working time is involved.

The parties will proceed to compute the time due each of the plaintiffs in keeping with the foregoing decision and submit a statement thereof to the court at an early date, at which time the matter of attorneys' fees and liquidated damages will be considered and a final judgment entered.