[No. 32512.   Department Two.   March 11, 1954.]

H. O. LINDELL et al., *Respondents and Cross-appellants,*
v. GENERAL ELECTRIC COMPANY, *Appellant.*[1]

*Metzger, Blair & Gardner,* for appellant.

*David E. Williams, Ivan Merrick,* and *Florence Merrick,*
for respondents and cross-appellants.

SCHWELLENBACH, J.—H. O. Lindell brought this action
under the fair labor standards act, as amended, 29 U. S. C. A.

[1]Reported in 267 P. (2d) 709.

(Sup.), § 201 *et seq.*, to recover overtime pay, liquidated damages, and attorneys' fees alleged to be due from General Electric Company, their employer, for services rendered the company between July 28, 1949, and July 28, 1951, or for a portion of such period of time. The action was brought by Lindell and two hundred ten other employees similarly situated. The trial court denied liquidated damages, holding that the company, through its agents and employees, acted in good faith in refusing to allow the disputed overtime pay; granted judgment in favor of all but three plaintiffs, but limited such recovery from April 3, 1950, holding that the statute of limitations barred recovery prior to that date; and allowed plaintiffs attorneys' fees in the sum of $17,500. Defendant company appeals from the judgment, and plaintiffs cross-appeal from that portion of the judgment denying recovery for overtime prior to April 3, 1950.

Appellant urges that the trial court erred in the following respects:

In making finding of fact No. 6;

"Plaintiffs were in the employ of defendant for the periods of time aforesaid, with duties of the aforesaid, at the following wage rates: . . . with time and one-half for all time worked over and above 40 hours per week and certain additional compensation for differentials in shifts worked. Plaintiffs were paid by the defendant at straight time for each 40 hours worked in each work-week and at time and one-half for all overtime worked in each work-week in excess of 40 hours per week, except for a one-half-hour lunch or rest period each work-day. That said 30-minute lunch or rest period each work-day was spent predominantly by each plaintiff for the use and benefit of defendant and therefore such 30-minute periods constitute compensable time worked."

In making finding of fact No. 7;

"That attached hereto as Exhibit 'A' and by this reference incorporated herein is a schedule setting forth the name of each plaintiff, together with the number of hours worked and not compensated for between July 28, 1949, and July 28, 1951, inclusive, and the number of hours

worked and not compensated for for each plaintiff between April 3, 1950, and July 28, 1951, inclusive."

In making conclusion of law No. V;

"Plaintiffs worked such over-time and are entitled to such pay between April 3, 1950, and July 28, 1951, as set forth in Exhibit 'A' attached to the Findings of Fact and incorporated therein by reference. The Portal-to-Portal Act of 1947 is inapplicable to said overtime and does not bar collection thereof."

In making conclusion of law No. IX;

"Attorneys for plaintiffs are entitled to attorney fees herein in the sum of $17,500.00." (No objection is made to the amount of the attorneys' fees, but it is urged that plaintiffs were not entitled to any recovery for overtime compensation and, hence, were not entitled to recover attorney fees.)

That the trial court erred in entering judgment in favor of the plaintiff-guards and against defendant General Electric Company.

The company contended before the trial court that it did not come within the provisions of the fair labor standards act because, in the performance of its contract with the atomic energy commission, it is not engaged in commerce or in the production of goods for commerce. However, it now states its position:

"The only question presented by appellant General Electric Company in this appeal is whether or not such one-half-hour lunch period was compensable working time under the Fair Labor Standards Act of 1938, as amended."

General Electric operates the Hanford Works, a government-owned plant engaged in the production of plutonium, under a contract with the atomic energy commission. It receives its costs and expenses, together with a fixed fee of $1.00. Title to all of the property, equipment, raw materials, and finished product is in the United States. Hanford Works comprises about six hundred forty square miles and is situated mostly in Benton county, and also partly in Franklin, Yakima, Grant, and Adams counties. There is a barricade around the entire production area. Inside are

seven distinct production areas, which are also barricaded. Access to the barricaded areas is granted only after security clearances have been given.

Respondents are employed as guards or patrolmen, and are stationed at various posts throughout the area. They are employed for a forty-hour week with time and one-half for work in excess of forty hours. Originally they carried their lunch out to the post and ate when it was convenient. Then the plan was inaugurated under which the men claim overtime. Each man was at the plant for eight and one-half hours. One witness testified that his shift checked in at 7:48 a. m. and out at 4:18 p. m. They could not eat their lunch at their post. Each man was required to leave his lunch at the headquarters of his particular area. During the day, usually between 10:30 a. m. and 1:30 p. m., a relief man would drive up to the post. The patrolman would drive the car to headquarters, where he would check in and then eat his lunch. At the expiration of one-half hour, he would check out and drive back to his post. His relief man would then drive to another post and the same procedure would follow. The relief men and the relief periods were staggered in such a manner that no more than four or five men were eating lunch at the same time.

The question now before us is whether such thirty-minute lunch period was compensable work time under the fair labor standards act of 1938, as amended.

The men testified generally that they were interrupted at various times during the lunch period, but that when this happened they were given a full thirty-minute period upon their return, regardless of the time spent before their interruption; that they were required to wear the uniform; that they could remove the gun from the holster, but that it was always required to be handy; that they could not read during this period; that they could not talk politics, religion, or unionism; that they could not play cards; that they could not lie down and rest, and that they were always under the control of some officer.

On the other hand the officers (captains, lieutenants, and sergeants—especially the sergeants) testified that each

headquarters where the men ate had a locker room, tables, and a hot plate for their convenience; that they spent their time eating, reading, and sleeping; that some went over to the fire hall and listened to the radio; that no restrictions were placed upon them during their lunch period; that they were not told where to eat—that they could eat wherever they pleased; that they were never interrupted; that during the thirty-minute lunch period the men were relieved of all duties and were not under any orders or control whatsoever.

In addition to the highly slanted testimony on both sides, the record does disclose that, during the lunch period, some of the men were interrupted to open the gate, to take part in a dry ice escort, to regulate the radio, to go to fires, to drive ambulances, to gas up cars, to relieve other men for whom no relief had been provided, and to respond to an emergency when an explosion occurred. As stated above, in each instance of an interruption during a lunch period, each man was reassigned to a new full thirty-minute lunch period. Although they could leave the headquarters room, they were told to advise the supervisor where they could be summoned at a moment's notice. The men were issued their guns by the supply sergeant when they came on shift and were held responsible for them until the guns were turned in to the supply clerk at the end of the shift. They were given special training on what to do in the event that any emergency should arise. Each man was given a "PATROL TRAINING MANUAL." It contained, among other things, the following:

"A. Abuse of machinery or property. (Sabotage)
"Report in writing all employees who damage or abuse any company or government property, giving name, number, full details and action taken. Apprehend all persons who maliciously destroy or damage company or government equipment. Report all evidence of sabotage.
" . . .
"C. Assemblages.
"Report in writing all meetings and assemblages held on the property of the Hanford Works which in any way suggests the overthrow or disrespect of any branch of the Federal, State or Local government; or any meeting which in

any, way might hinder construction or production giving name, address, nationality and sex of speakers and their sponsors; if employees, their badge number."

The manual also advised as to the handling of panic and mob violence. In addition, it devoted several pages to the use of riot guns and submachine guns.

Thomas B. Farley, chief supervisor of the security and patrol unit, was called as a witness by the plaintiffs. Under him are the administrative chief and the chief of the outer patrols. Under them are four captains, thirty-two lieutenants, the sergeants and patrolmen. Mr. Farley testified:

"Q. Is it the general duty of all the patrol to guard against carelessness, negligence, thievry, depredation, fire, and preserve order? A. That is essentially their work. Q. They are patrolmen whose duty it is to guard the property? A. Safeguard the lives and property under the area. Q. And the property in the area, I take it, is very valuable? A. Very valuable. Q. On top of that it is very secretive? A. Yes sir. Q. You want your men to be on their toes and efficient at all times? A. Very much so."

Under cross-examination, he testified:

"Q. You were asked if you expected the guards to be on their toes at all times. By that did you mean the relief period too? A. No."

And then, under redirect:

"Q. Suppose paratroopers would come during the lunch hour, would you want them to get busy? A. If they wanted to live they had better. Q. The plant has to be protected as well as the men themselves? A. Yes."

Mr. Farley was called again as a witness for the defense. He testified that the average age of the members of the patrol was around forty years; that they were not equipped to fight young suicide troops—that that was a military problem. Under cross-examination, he testified that he wanted enough men at all times to properly guard the plant; that, except possibly in case of invasion, he wanted to be ready for every foreseeable eventuality.

We have read all of the cases cited by counsel for both sides arising under the fair labor standards act. Very few

of them are of any assistance to us in deciding our present problem.

In *Armour & Co. v. Wantock*, 323 U. S. 126, 89 L. Ed. 118, 65 S. Ct. 165, Mr. Justice Jackson, speaking for the court, said:

"It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion. To keep opinions within reasonable bounds precludes writing into them every limitation or variation which might be suggested by the circumstances of cases not before the Court. General expressions transposed to other facts are often misleading. The context of the language cited from the *Tennessee Coal* case should be sufficient to indicate that the quoted phrases were not intended as a limitation on the Act, and have no necessary application to other states of facts.

"Of course an employer, if he chooses, may hire a man to do nothing, or to do nothing but wait for something to happen. Refraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity. Readiness to serve may be hired, quite as much as service itself, and time spent lying in wait for threats to the safety of the employer's property may be treated by the parties as a benefit to the employer. Whether time is spent predominantly for the employer's benefit or for the employee's is a question dependent upon all the circumstances of the case."

In *Tennessee Coal, Iron & R. Co. v. Muscoda Local*, 321 U. S. 590, 88 L. Ed. 949, 64 S. Ct. 698, 152 A. L. R. 1014, it was held that time spent by miners in traveling by foot to and from their stations at the bottom of the mine shafts constituted work under the act. The court said:

"Such travel, furthermore, is not primarily undertaken for the convenience of the miners and bears no relation whatever to their needs or to the distance between their homes and the mines. Rather the travel time is spent for the benefit of petitioners and their iron ore mining operations."

*Culkin v. Glenn L. Martin Nebraska Co.*, 97 F. Supp. 661, was an action for overtime by guards and firemen employed by the Martin Company, which was operating an airplane

assembly and modification plant at Fort Crook, Nebraska, under a contract with the United States government. There, as here, the men were given a thirty-minute lunch period under circumstances very similar to those in the case at bar. There, as here, in case of an interruption during the lunch period, the men were reassigned to a new full lunch period. The district court found that:

"The employees involved in the present case were not waiting to be engaged; they had been engaged to wait. The defendant contends, however, that even though the employees were 'on call' during the lunch period that the employees did not spend the time during this period predominantly for the benefit of the employer. . . .

"The defendant company not only accepted the usefulness of the protective force during the lunch period, but it imposed restrictions which would guarantee the same. The restrictions (requiring the employees to eat in certain areas, to remain in full uniform, to be constantly vigilant for signals and calls, to check for badge infractions, to prevent disturbances, etc.) deprived the employees of that degree of freedom during the lunch period which would have enabled them to adequately and comfortably enjoy the time as their own. This conclusion seems neither unwarranted nor unusual."

Judgment was rendered for time and one-half overtime under the provisions of the fair labor standards act.

Upon appeal, the circuit court affirmed (*Glenn L. Martin Nebraska Co. v. Culkin,* 197 F. (2d) 981), saying:

"Although the guards were constantly obliged to prevent disturbances by their presence and vigilance, and the firemen were likewise obligated to be constantly vigilant to prevent fires, yet both the guards and the firemen served to a considerable extent in a stand-by capacity. In the latter respect both were engaged in their regular duties during the 30-minute period as effectively as if they were putting down disturbances or putting out fires."

When we consider that this patrol was a semi-military organization; when we consider the enormity of the project, its importance to our national security, the necessity for absolute secrecy, and the responsibility of the guards and patrolmen for life and property, we are forced to the

conclusion that these men were in a different position than guards and patrolmen in ordinary plants. They were screened for security reasons. They were trained to be alerted for any emergency that might arise. Regardless of the testimony of some of the officers, we are convinced, from the record, that, during the thirty-minute lunch period, these patrolmen were not free agents and under no restrictions whatsoever. They were under the domination and control of their superiors and were subject to be called out on a moment's notice. They "were not waiting to be engaged; they had been engaged to wait." The time spent during the thirty-minute lunch period was predominantly for the employer's benefit.

The summons in this case listing all of the plaintiffs by name was filed with the Benton county clerk July 28, 1951. The complaint, containing two hundred eleven causes of action, and bearing the verification of only one plaintiff, V. R. Miller, was filed August 4, 1951. An amended complaint was filed December 31, 1951. Individual consents to become parties plaintiff were filed by two hundred nine of the plaintiffs April 3, 1952. The trial court held that, with the exception of Miller, any claims for compensation allowable to the plaintiffs, prior to April 3, 1950, were barred by the statute of limitations. Plaintiffs cross-appeal from that portion of the judgment allowing them compensation only from that date.

The applicable statutes are:

"Any action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act—

"(a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued." 29 U. S. C. A. (Sup.), § 255

"In determining when an action is commenced for the purposes of section 255 of this title; an action commenced on or after May 14, 1947 under the Fair Labor Standards

Act of 1938, as amended, the Walsh-Healey Act, or the Bacon-Davis Act, shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the Fair Labor Standards Act of 1938, as amended, or the Bacon-Davis Act, it shall be considered to be commenced in the case of any individual claimant—

"(a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or

"(b) if such written consent was not so filed or if his name did not so appear—on the subsequent date on which such written consent is filed in the court in which the action was commenced." 29 U. S. C. A. (Sup.), § 256

Cross-appellants contend that the intent of Congress was to require *either* the naming of each individual plaintiff *or* the filing of his consent, but not both. They say in their brief:

"It is the contention of the cross-appellants that this conflict shows that the word 'and' in Section 256 (a) was meant to be 'or,' and that some error in transcription must have been made in the original Act, possibly a stenographer's typographical mistake.

"If we change the 'and' to 'or' in 256 (a), we have the provision that in a collective suit the action shall be considered to be commenced in the case of any individual claimant

"(a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint *or* his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or,

"(b) if such written consent was not so filed *or* if his name did not so appear—on the subsequent date on which such written consent is filed in the court in which the action was commenced."

Our answer to that suggestion is plain and simple. Far be it from this court to attempt to rewrite an act of Congress. Be that as it may, we feel that Congress meant just what it said, and we have no difficulty in understanding its language. This is a collective or class action. Under § 256(a), two things must concur to have an action com-

menced on the date the complaint is filed. An individual claimant must be specifically named as a party plaintiff *and* his written consent to become a party plaintiff must be filed in court on the same day. Turning now to § 256(b), we find that, if the written consent was not filed as provided in subsection (a), or if his name did not appear in the complaint (either of these two), then the action shall be considered to be commenced on the subsequent date on which the written consent was filed in the court in which the action was commenced.

In the case at bar, the action was considered to be commenced on the date the complaint was filed only as to the plaintiff Vernon R. Miller, who verified the complaint. As to the others, it was commenced April 3, 1952, the subsequent date on which their written consents were filed.

The judgment is affirmed. Each side shall pay for its own briefs. Appellant shall bear all other costs on appeal.

GRADY, C. J., HAMLEY, DONWORTH, and FINLEY, JJ., concur.