MABEE ET AL. *v.* WHITE PLAINS PUBLISHING CO.

No. 57.   Argued December 5, 1945.—Decided February 11, 1946.

*David H. Moses* argued the cause for petitioners. With him on the brief was *Morton Lexow.*

*Elisha Hanson* argued the cause for respondent. With him on the brief was *Letitia Armistead.*

By special leave of Court, *Jeter S. Ray* argued the cause for the Administrator of the Wage and Hour Division, United States Department of Labor, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General McGrath, William S. Tyson* and *Bessie Margolin.*

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondent publishes a daily newspaper at White Plains, New York. During the period relevant here, its daily circulation ranged from 9,000 to 11,000 copies. It had no desire for and made no effort to secure out-of-state circulation. Practically all of its circulation was local. But about one-half of 1 per cent was regularly out-of-state.[1] Petitioners are some of respondent's employees. They brought this suit in the New York courts to recover overtime compensation, liquidated damages and counsel fees pursuant to § 16 (b) of the Fair Labor Standards Act of 1938. 52 Stat. 1069, 29 U. S. C. § 216 (b). The supreme court gave judgment for the petitioners. 179 Misc. 832, 38 N. Y. S. 2d 231; 180 Misc. 8, 41 N. Y. S. 2d 534. The appellate division reversed and ordered the complaint to be dismissed. 267 App. Div. 284, 45 N. Y. S. 2d 479. That judgment was affirmed by the court of

---

[1] About 45 copies daily. There appears to have been an out-of-state circulation of 43, 46, and 40 for the years ending March 31, 1939, 1940, and 1941 respectively.

appeals without opinion. 293 N. Y. 781, 58 N. E. 2d 520; 294 N. Y. 701, 60 N. E. 2d 848. The case is here on a petition for a writ of certiorari which we granted because of the probable conflict between the decision below and those from the federal courts.[2]

The appellate division applied the maxim *de minimis* to exclude respondent from the provisions of the Act. We think that was error. The Court indicated in *Labor Board* v. *Fainblatt,* 306 U. S. 601, 607, that the operation of the National Labor Relations Act (49 Stat. 449, 29 U. S. C. § 151) was not dependent on "any particular volume of commerce affected more than that to which courts would apply the maxim *de minimis.*" That Act,[3] unlike the present one (*Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 570–571), regulates labor disputes "affecting" commerce. 49 Stat. 450, 29 U. S. C. § 152. We need not stop to consider what different scope, if any, the maxim *de minimis* might have in cases arising thereunder. Here Congress has made no distinction on the basis of volume of business. By § 15 (a) (1) it has made unlawful the shipment in commerce of "*any* goods in the production of which *any* employee was employed in violation of" the overtime and minimum wage requirements of the Act. Though we assume that sporadic or occasional shipments of insubstantial amounts of goods were not intended to be included in that prohibition, there is no warrant for assuming that regular shipments in commerce are to be included

[2] Cf. *Davis* v. *Goodman Lumber Co.,* 133 F. 2d 52, 53; *Sun Publishing Co.* v. *Walling,* 140 F. 2d 445, 448; *New Mexico Public Service Co.* v. *Engel,* 145 F. 2d 636, 640.

[3] Sec. 1 of that Act is a statement of the policy of Congress. It states that the denial by employers of the right of the employees to bargain collectively has the intent or effect of burdening or obstructing commerce by "materially affecting" the flow of goods from or into the channels of commerce or by "causing diminution of employment and wages in such volume as substantially to impair or disrupt" the market for such goods.

or excluded dependent on their size. That has been the consistent position of the Administrator. Interpretative Bull. No. 5, par. 9 (1939), 1944–45 Wage Hour Man. 21. His rulings and interpretations, "while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore* v. *Swift & Co.*, 323 U. S. 134, 140.

We stated in *United States* v. *Darby*, 312 U. S. 100, 123, "Congress, to attain its objective in the suppression of nationwide competition in interstate commerce by goods produced under substandard labor conditions, has made no distinction as to the volume or amount of shipments in the commerce or of production for commerce by any particular shipper or producer. It recognized that in present-day industry, competition by a small part may affect the whole and that the total effect of the competition of many small producers may be great." And see *Warren-Bradshaw Co.* v. *Hall,* 317 U. S. 88, 91. That view is borne out by the legislative history of the Act. Earlier drafts had embodied the "substantial" standard.[4] These

---

[4] See, for example, H. R. 7200, 75th Cong., 1st Sess., introduced May 24, 1937. It provided for a Labor Standards Board to administer the Act. The Board was to be given the power to establish minimum wages when it found, *inter alia*, that wages lower than a minimum fair wage were paid to employees "engaged in the production of goods which are sold or shipped to a substantial extent in interstate commerce . . ." § 5 (a).

The Confidential Committee Print of April 13, 1938, containing a proposed amendment to S. 2475, 75th Cong., 3d Sess., and embodied in the Committee Print of April 15, 1938, S. 2475, 75th Cong., 3d Sess., would have limited the applicability of the Act to employers "engaged in commerce in any industry affecting commerce . . ." §§ 4, 5. It was further provided by § 6 of the draft that the Secretary of Labor should, after notice and hearing, determine the relation of the various industries to commerce. Only if the Secretary found that the industry was (a) "dependent for its existence upon substantial purchases or sales of goods in commerce and upon transportation in

were omitted from the coverage provisions of the one which became the law. Moreover, one of the exemptions written into the Act extends to "any employee employed in connection with the publication of any weekly or semi-weekly newspaper with a circulation of less than three thousand the major part of which circulation is within the county where printed and published . . ." § 13 (a) (8). Representative Creal of Kentucky proposed this exemption. He stated that "under this bill, because 1 or 2 percent of a paper's circulation goes outside to people who want to get the home-town paper to see whether or not Lucy got married, or whether Sally's baby has been born yet, because that infinitesimal bit of their business is with people outside the county, these publishers fall under the provisions of this bill, when on each side of this little printshop are the butcher and the baker, who are exempt and who are financially better fixed than he is." 83 Cong. Rec. p. 7445. No such exemption for daily newspapers was granted.[5] No exemption on the basis of volume of out-of-state circulation was written into the Act. Rather the exemption of the small weeklies or semi-weeklies seems to have been adopted on the assumption that without it a newspaper with a regular out-of-state circulation, no matter how small, would be under the Act. The choice Congress made was not the exemption of newspapers with small out-of-state circulations but the exemption of certain types of small newspapers. We would change the nature of the exemption which Congress saw fit to grant,

commerce," or (b) "Nation-wide in . . . scope," or (c) related to commerce "in other respects close and substantial," could the Secretary issue an order declaring the industry to be one affecting commerce and thus within the purview of the Act.

[5] A number of bills have been introduced since the passage of the Act to secure a similar exemption for daily newspapers, but none of them has passed. See H. R. 7340, 76th Cong., 1st Sess.; S. 4385, 76th Cong., 3d Sess.; H. R. 64, H. R. 4208, S. 1310, S. 284, 77th Cong., 1st Sess.

if we applied the maxim *de minimis* to this type of case. We would also disregard the plain language of § 15 (a) (1) prohibiting the shipment in commerce of "any goods" in the production of which "any employee" was employed in violation of the overtime and minimum wage requirements of the Act.

Respondent argues that to bring it under the Act, while the small weeklies or semi-weeklies are exempt by reason of § 13 (a) (8), is to sanction a discrimination against the daily papers in violation of the principles announced in *Grosjean* v. *American Press Co.,* 297 U. S. 233.   Volume of circulation, frequency of issue, and area of distribution are said to be an improper basis of classification.   Moreover, it is said that the Act lays a direct burden on the press in violation of the First Amendment.   The *Grosjean* case is not in point here.   There the press was singled out for special taxation and the tax was graduated in accordance with volume of circulation.   No such vice inheres in this legislation.   As the press has business aspects, it has no special immunity from laws applicable to business in general.   *Associated Press* v. *Labor Board,* 301 U. S. 103, 132–133.   And the exemption of small weeklies and semi-weeklies is not a "deliberate and calculated device" to penalize a certain group of newspapers.   *Grosjean* v. *American Press Co., supra,* p. 250.   As we have seen, it was inserted to put those papers more on a parity with other small town enterprises.   83 Cong. Rec. 7445.   The Fifth Amendment does not require full and uniform exercise of the commerce power.   Congress may weigh relative needs and restrict the application of a legislative policy to less than the entire field.   *Steward Machine Co.* v. *Davis,* 301 U. S. 548; *Currin* v. *Wallace,* 306 U. S. 1, 13–14.

We hold that respondent is engaged in the production of goods for commerce.   That, of course, does not mean that these petitioners, its employees, are covered by the Act. The applicability of the Act to them is dependent on the

character of their·work.  *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 524; *Walling* v. *Jacksonville Paper Co., supra,* pp. 571–572.  We express no opinion on that phase of the case, as the New York appellate courts did not pass on it. Since the judgment below must be reversed, the question whether the Act is applicable to these employees will be open on the remand of the cause.

*Reversed.*

MR. JUSTICE JACKSON took no part in the consideration or decision of this case.

MR. JUSTICE MURPHY, dissenting.

I agree that to print approximately 10,000 newspapers a day and regularly to send 45 of them, or ½ of 1%, out of the State is to produce goods for interstate commerce. But I cannot agree that Congress meant to include a business of that nature within the ambit of the Fair Labor Standards Act of 1938.

This Court, in *Labor Board* v. *Fainblatt,* 306 U. S. 601, 606, stated that "The amount of the commerce regulated is of special significance only to the extent that Congress may be taken to have excluded commerce of small volume from the operation of its regulatory measure by express provision or fair implication."  Concededly, Congress has not excluded commerce of small volume from the coverage of the Fair Labor Standards Act by "express provision."  But certainly the "fair implication" is one. of exclusion.  On numerous occasions we have pointed out that Congress in this Act did not exercise the full scope of its commerce power, *Kirschbaum Co.* v. *Walling,* 316 U. S. 517, 522–523, and that Congress plainly indicated its purpose to leave local business to the protection of the States so far as wage and hour problems were concerned, *Walling* v. *Jacksonville Paper Co.,* 317 U. S. 564, 570; *Phillips Co.* v. *Walling,* 324 U. S. 490, 497.

In my opinion, a company that produces 99½% of its products for local commerce is essentially and realistically a local business. True, ½ of 1% of its production is for interstate commerce, thus subjecting it to the constitutional power of Congress when and if exercised. But that fact does not make it any less a local business, which we have said Congress plainly excluded from this Act.

I would therefore affirm the judgment below in this respect.