CLOUGHERTY v. JAMES VERNOR CO.
Civil Action No. 4745.

District Court, E. D. Michigan, S. D.
Aug. 1, 1947.

covered by the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq. The period is from March 23, 1939, to December 31, 1944, and five different functions of defendant's employees are involved—

(a) City drivers,

(b) City salesmen's helpers,

(c) Highway drivers,

(d) Shipping room foreman, and

(e) Chief router.

The first three classes include several employees, (d) and (e) each one. Since January 1, 1945, however, (a), (b) and (c) have been compensated according to the Fair Labor Standards Act, but without defendant admitting legal liability.

### Statement of Facts.

Here are the pertinent facts: Defendant, Vernor Company of Detroit, manufactures and sells ginger ale in 8 and 24 ounce bottles, placed in cardboard cartons, either containing 2 dozen 8-ounce or one dozen 24-ounce bottles.

During the period involved the company couldn't keep up with demand for its product, either because of lack of its own delivery facilities, or because of shortage of some necessary ingredient such as sugar. As a result sometimes both filled and empty cases of bottles were stored at the plant from three days to two weeks.

The facts show that to cover breakage and loss (estimated 3%) new bottles were purchased, but the manufacturing process and route of the bottle, whether new or one that had been returned after its contents consumed, begins when it is placed on a conveyor which carries it to the soaking and rinsing room where it is cleaned, sterilized and rinsed, then to the syrup machine where extract and syrup are added, to the filling room for the carbonated water, the crowning machine where it is capped, and then to the "spinner" where the ingredients are properly agitated. The next and final steps are the placing of the bottles in cardboard cases and transferred by a conveyor to the stock room ready for shipment.

Class (a), the city driver, got his consignment, orders and routing instructions from the shipping room foreman and, in

Arthur J. Hass, of Detroit, Mich., for plaintiff.

Clark, Klein, Brucker & Waples, of Detroit, Mich., for defendant.

PICARD, District Judge.

The question in this case is whether certain employees of defendant company are

making his deliveries, usually received back empty bottles from the retail outlet to the same extent as he delivered. On his return to the Vernor plant the truck body containing these empty bottles was lifted by a crane from the chassis, swung into the plant, the empty bottles unloaded by shipping floor employees from which point they proceeded to the stock pile in the plant to be stored until they began their new journey. In the ordinary course none of the bottles delivered to Michigan dealers would go out of the state on that particular trip, but the company had eight warehouses outside Michigan and during the period in question from 14 to 20 per cent of all its ginger ale went out of Michigan. It can be assumed that some of the bottles delivered to retail stores in Detroit one week and picked up later were the same bottles that went into interstate commerce on their second trip. Whether the number was more or less than the ratio of interstate to intrastate sales would be practically impossible to ascertain but we believe this court would be safe in assuming that such ratio over a period of a year would average just about the same as in and out of state sales since bottles used in the State of Michigan were not segregated each trip from bottles used for the out-of-state consumer.

Some city drivers made deliveries to the boat dock companies along the Detroit River, sometimes to boats plying on the Great Lakes and to manufacturing places admittedly engaged in interstate commerce.

In addition to the city drivers there were city salesmen, admittedly independent contractors who had helpers (class (b), above, paid by defendant. These men helped in delivering the filled and getting back the empty cases. They might even assist in driving the salesman's truck. These city salesmen's helpers also went with the highway drivers outside of Detroit performing the same work for the highway drivers as they did for the city salesmen.

The highway drivers delivered ginger ale to eight branch warehouses in different cities in Michigan and to the eight warehouses outside the state. They might work a full week exclusively in transporting stock either in or out of Michigan, or the week might see them transporting ginger ale both in and out of Michigan. So the issue as to them also includes the question of whether they come under the Fair Labor Standards Act or are controlled by the Motor Carrier Act, 49 U.S.C.A. § 301 et seq.

The shipping room foreman had charge of loading the trucks and work incidental to delivery of the ginger ale in and out of Michigan and the chief router made up the routes for all city deliveries. These two, defendant contends, are exempt, one as an executive, the other as an administrator.

It is contended by plaintiff that since there is no segregation of returned Michigan bottles from those returned from out of state, and because of their activities in picking up Michigan empties, putting them on trucks, taking them back to the plant, where upon refilling many of these same bottles went into interstate commerce, that all (a), (b), (c), (d) and (e) came under the Fair Labor Standards Act since they were all engaged "in the production of goods for commerce."

Defendant does not deny that most of its other employees come under the Fair Labor Standards Act, and it is admitted that as to these employees defendant has complied with the Act's provisions; but it denies the Act covers any employees classed in (a), (b), (c) (d) or (e).

We first discuss the city drivers because if they are covered by the Fair Labor Standards Act, then (b) and (c) are also covered.

### Conclusions of Law.

As a result of numberless decisions there are certain well recognized beacons of light illuminating the highway of the Fair Labor Standards Act which are indicative of its general scope, and which must be considered in arriving at our conclusions.

For example, it has become well established that some employees of a firm which is admittedly engaged in interstate commerce may come under the Fair Labor Standards Act while others among its employees do not. Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L. Ed. 460. And it is also well fixed that the maxim "de minimis" is not applicable if the employee concerned engaged in producing

"any" goods which could reasonably be expected to find their way into interstate commerce. Mabee v. White Plains Pub. Co., 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607. And all those engaged in interstate commerce or in the "production" of those goods are affected and covered by the act. Mabee v. White Plains Pub. Co., supra; Schulte Co. v. Gangi, 328 U.S. 108, 66 S.Ct. 925, 90 L.Ed. 1114, 167 A.L.R. 208

■ It has also been held that "no ritual of placing goods in a warehouse can be allowed to defeat" the interstate nature of the entire transaction, and "a temporary pause in their transit does not mean they are no longer 'in commerce'" within the meaning of the Act. Walling v. Jacksonville Paper Co., supra [317 U.S. 564, 63 S. Ct. 335].

Turning to the facts it is admitted that the sale of ginger ale by the Vernor Company out of state was not sporatic and if these city drivers by the act of picking up Vernor's empty bottles and cases and returning them to the Vernor plant, where it it reasonable to assume that 14 to 20 per cent of them then went into interstate commerce—if by those acts those employees are "producing goods" for commerce, they come under the provisions of the Fair Labor Standards Act.

And that is the main question here.

Two definitions become important: What is meant by "goods"? And What is meant by "produced"? "Goods" is defined in Section 203(i) of the Fair Labor Standards Act as meaning:

"* * * goods, wares, products, commodities, merchandise, or articles or subjects of commerce of any character, or any part or ingredient thereof, but does not include goods after their delivery into the actual physical possession of the ultimate consumer thereof other than a producer, manufacturer, or processor thereof."

And Sec. 203(j) of the same Act, defines "produced" as

"* * * produced, manufactured, mined, handled, or in any other manner worked on in any state; and for the purposes of this Act an employee shall be deemed to have been engaged in the production of goods if such employee was employed in producing, manufacturing, mining, handling, transporting, or in any other manner working on such goods, or in any process or occupation necessary to the production thereof, in any State."

To substantiate his point many citations are presented by plaintiff, among them Griffin Cartage Co. v. Walling, 6 Cir., 153 F.2d 587, affirmed on appeal from this court and which is perhaps the nearest of all cases so cited to the one at bar. There we held that employees of a cartage company that transported castings from one plant to another, within the city of Detroit, for additional processing, and then to the manufacturer to be placed in an automobile sold and shipped in interstate commerce, were engaged in the production of goods for commerce, the test being whether this was a step in the journey of these goods into interstate commerce, and if so, however slight that step might be, it became a part of the production of such goods.

But a mere review of the facts in the Griffin case emphasizes the difference between it and the facts here because there the transporting and handling of castings between plants *while they were being worked upon* was all part of the production of the completed article. In the case at bar returning the bottles to the Vernor plant was all done before production was even started on ginger ale that went into interstate commerce.

■■ Nor is plaintiff's contention that each store where the driver picked up empty bottles became in fact a manufacturing plant of bottles or "goods" for the use of defendant, sound. It cannot be seriously contended that defendant through its city drivers engaged in the manufacture of bottles, and the empty bottles in the hands of the Vernor Company were not "goods" within the meaning of the Act. They were goods in the hands of the manufacturer of the bottles who sold them in interstate commerce to Vernor. Western Union Tel. Co. v. Lenroot, 323 U.S. 490, 65 S.Ct. 335, 89 L.Ed. 414; Orange Crush Bottling Company v. Tuggle, 70 Ga.App. 144, 27 S.E.2d 769. If defendant Vernor had been in the

business of selling bottles and had sent its drivers out to get bottles by purchase or gift, then placed them on the avenue that led to interstate commerce, the situation would be different. Orange Crush Bottling Co. v. Tuggle, supra. But the bottles here were not part of the ingredients of the ginger ale and while it might be argued that they were "necessary" in the manufacture of this particular ginger ale because they were put on the "twirling" machine to have the ingredients properly mixed, they were not part of the finished product. And every necessary step taken in the manufacture of goods sold in interstate commerce does not bring the doer under the Act. 10 East 40th St. Bldg. v. Callus, 325 U.S. 578, 65 S.Ct. 1227, 89 L.Ed. 1806, 161 A.L.R. 1263. In the twirling process the bottle became part of the machinery and was not within the orbit of production by the employees who brought them to the warehouse because if you were to follow such reasoning to its logical conclusion the person who removed the cap in order to drink the ginger ale would be engaged in interstate commerce. See dissent Borden Co. v. Borella, 325 U.S. 679, 65 S.Ct. 1223, 89 L.Ed. 1865, 161 A.L.R. 1258.

In the Western Union Telegraph Co. v. Lenroot case, supra, the court carefully explains that while the statute defines the word "produced" to mean "handled" or "worked on," it has not defined either the word "handled" or the words "worked on." That became the duty of the Supreme Court. In that case the messengers who brought messages to the Western Union office for transmittal claimed that they were engaged in interstate commerce, but in defining the meaning of the word "produced," the court held that the telegrams were not fabricated by the messengers any more than the bottles are fabricated here. To us it is apparent that picking up those telegrams for transmission was even more necessary and instrumental in completing the finished product, to-wit, the message delivered in another state, than the picking up of the bottles here because one bottle could substitute for another, but one message couldn't substitute for another message. Justice Jackson in that case said [323 U.S. 490, 65 S.Ct. 342]:

"If we go beyond this and assume that handling for transit purposes is handling in production, we encounter results which we think Congress could not have intended."

So after reading the several cases that have been presented to this court, we have arrived at the conclusion that the act of handling alone is not sufficient unless the handling is in the course of the production of the "goods," and not too remote therefrom. See 10 East 40th St. Bldg. v. Callus, supra.

Applying that reasoning to the case at bar, let us follow the course of five bottles. They were manufactured and sold to Vernor from another state. The manufacturer of those bottles was engaged in interstate commerce. The bottles then belonged to Vernor. Today four of those bottles were distributed in the State of Michigan; one went to Ohio. But the journey of each bottle was not complete until it was returned to the Vernor plant. That, in our opinion, is the crux of the difference marking this case from those cited by plaintiff. Obviously the same bottle might go into interstate commerce tomorrow, next week, two weeks or a month after its first journey, and those who handled it on such trips were compensated according to the Fair Labor Standards Act. Still it is not the peripatetic life of the bottle that is important; it's the activities of the person who handled that bottle. Nothing that the city driver did affected interstate commerce because his work was not complete until the bottle was returned, during which entire time he had nothing to do with interstate commerce or the production of goods for commerce. And as a returned empty bottle it was not "goods" in the hands of Vernor sufficient to bring it under the Fair Labor Standards Act. To hold otherwise is to extend the intent of Congress ad infinitum to include almost everything the local merchant sees or touches. Surely Congress did not conceive such an interpretation.

We hold, therefore, that neither the city driver nor the city salesmen's helper come under the Fair Labor Standards Act for the period sued.

### Highway Drivers.

█ This court having ruled as it has on city drivers and city salesmen's helpers, necessarily applies the same reasoning to the highway drivers whose functions were restricted to the State of Michigan. And as to those who drove interstate or partly inter and partly intrastate, the rule laid down by the Supreme Court in Levinson v. Spector Motor Service, 330 U.S. 649, 67 S.Ct. 931, 948 (March 31, 1947), must prevail. It was held in that case that they are not subject to the Fair Labor Standards Act.

The question involved was whether the Interstate Commerce Commission had power under Par. 204 of the Motor Carrier Act of 1935 to establish qualifications and maximum hours of service with respect to any "Checker" or "terminal foreman" a substantial part of whose activities in that capacity consisted of doing or immediately directing the work of one or more loaders of freight for an interstate motor carrier. The court discussed the question of safety of operations, as well as the history of the conflict between interpreters of the Fair Labor Standards and the Motor Carrier Acts and in reaching its conclusion in the Levinson case the court held that "checkers" and "terminal foremen" were engaged in "safety of operations." It said:

"Our conclusion is that, under the Motor Carrier Act, the Interstate Commerce Commission has power to establish qualifications and maximum hours of service for those employees whose service affects the safety of transportation of common carriers, contract carriers or private carriers of property in interstate and foreign commerce; that such Commission has been charged with the administration and enforcement of that Act; and that in the course of performance of its duties and after extended hearings on the subject, it has found that the work of loaders, as defined by it, affects safety of motor carrier operation. Furthermore, we conclude, upon the findings of the lower courts in this case, that the petitioner was employed by a motor carrier of interstate freight within the meaning of the Motor Carrier Act and that, throughout the period at issue, a sub-stantial part of his activities consisted of doing, or immediately directing, the work of one or more loaders as defined by the Interstate Commerce Commission and affecting the safety of operation of motor vehicles in interstate or foreign commerce; that, accordingly, the Commission, with respect to him, had power to establish qualifications and maximum hours of service; and that, by virtue of § 13(b) (1) of the Fair Labor Standards Act [29 U.S.C.A. § 213(b) (1)], the provisions of § 7 of that Act [29 U.S.C.A. § 207], as to overtime pay were rendered inapplicable to him."

See also Anuchick v. Transamerican Freight Lines, D.C., 46 F.Supp. 861.

### The Foreman and Router.

As to classes (d) and (e), the problems presented by the status of the shipping room foreman and chief router are not perplexing. In each instance it is apparent that these men must have a great deal of special training to prepare them to become adept at their work and able to perform their duties.

█ Mr. Vetor (the shipping room foreman) had complete charge of shipping from the floor with the power to hire and fire. He directed the work of 30 or 32 men in that section of the department. He was permitted to exercise discretion. He received more than $30 a week in salary and while he may have done some manual work as an aid to the other employees from time to time, he did not spend 20 per cent of the total hours he worked in each work week in that capacity. The difference in pay-check between one doing manual labor and the head of a department does not ban participation by the foreman from all manual labor. It is an American characteristic of the relationship of executive and those under him that the foreman might "pitch in" almost any time to help. He would be the exception if he didn't. We hold that under the Administrator's Regulations, Section 541.1, Vedor was an executive. Walling v. General Industries Co., D.C., 60 F. Supp. 549, decided by the Supreme Court March 31, 1947, 330 U.S. 545, 67 S.Ct. 883.

 In the case of the chief router, John Like, we believe that he comes under Section 541.2 as an administrator. He

meets the requirements and his compensation for services was much higher than $200 per month. In addition he exercised discretion and independent judgment. Incidentally, it must be remembered that when the particular employee has a salary of over $200 a month, he is, or is not, an administrator dependent upon whether he meets any one—not necessarily all the requirements of the succeeding subdivisions of Section 541.2. George Lawley & Son Corporation v. South, 1 Cir., 140 F.2d 439, 151 A.L.R. 1081; Burke v. Lecrone-Benedict Ways, D.C., 63 F.Supp. 883.

Undoubtedly these men are exempt from the provisions of the Fair Labor Standards Act.

### Exception.

There are a few of these employees, however, whom we believe are covered by the Fair Labor Standards Act not because they are in any way "producing goods for commerce" but because they are themselves employed in interstate commerce. We refer to those employees from either class (a), (b) or (c) who participated in delivery of ginger ale from the Vernor plant to the docks of vessels that ply the Great Lakes or vessels known to carry the ginger ale into interstate commerce. We do not refer to the ordinary boat dock along the Detroit River, and we do not believe that the rule applies to those drivers or helpers who might have made delivery to manufacturing plants. We can see no element there of such employees being engaged in interstate commerce or in the production of goods for commerce.

But we hold that those who participated in delivery of ginger ale to the dock of such vessels as the D & C are engaged in interstate commerce. We rely upon two citations. Hamlet Ice Co. v. Fleming, 4 Cir., 127 F.2d 165; Enterprise Box Co. v. Fleming, 5 Cir., 125 F.2d 897. The extent of plaintiff's recovery, however, depends upon how much time was spent by each employee in each particular week making that type of delivery. During the period involved the administrator had held that anyone engaged 20 per cent in interstate commerce would come under the act for that particular week, so that is the rule for compensation necessarily used by this court. If the parties are unable to agree on the amount in this matter further hearings will be held.

A judgment in accordance with this opinion may be presented for our signature.