Ralph **BOEKEMEIER**, Plaintiff,

v.

**FOURTH UNIVERSALIST SOCIETY IN THE CITY OF NEW YORK and the Board of Trustees of Fourth Universalist Society in the City of New York, Defendants.**

**No. 96 CIV. 1459 JES.**

United States District Court, S.D. New York.

Feb. 15, 2000.

Randall David Bartlett, Bartlett, Bartlett & Ziegler, New York City, for Plaintiff.

Kenneth A. Margolis, Kauff, McClain & McGuire, New York City, for Defendant.

## MEMORANDUM OPINION AND ORDER

SPRIZZO, District Judge.

Plaintiff Ralph Boekemeier, a former employee of defendants the Fourth Universalist Society in the City of New York ("Church") and the Board of Trustees of Fourth Universalist Society in the City of New York ("Board"), brings the instant action against defendants pursuant to the Fair Labor Standards Act ("FLSA" or the "Act"), 29 U.S.C. § 201 *et. seq.,* for overtime wages for services rendered for the Church in excess of 35 hours per week. Plaintiff also asserts state law claims for breach of contract and for quantum meruit recovery for his services. Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendants move and plaintiff cross-moves for summary judgment. For the reasons stated below, plaintiff is granted partial summary judgment and defendant is granted partial summary judgment.

## BACKGROUND

A ruling on the instant motions for summary judgment turns primarily upon the extent to which either the Church or plaintiff has engaged in interstate commerce as this term is interpreted by the FLSA. The Church itself is a nonprofit corporation that supplements its income by leasing its facilities and property on a short and long-term basis to individuals and organizations. *See* Joint Statement of Material Facts As To Which There Is No Genuine Dispute, dated November 13, 1997 ("Jt.Stmnt."), at ¶ 11. In soliciting customers to rent its facilities, the Church performs monthly mass mailings, issues press releases and places advertisements in magazines and on the Internet. *Id.* at ¶¶ 12–14. Approximately half of the groups that rented space from the Church in 1996 for special events were from a state other than New York. *Id.* at ¶ 73.

The Church's total income for each fiscal year from 1993 to 1996 surpasses $500,000. As audited, such income can be divided into the categories of rental income, contributions,[1] investment income,[2] special events income,[3] miscellaneous income,[4] gain on sale of investments,[5] social action committee income,[6] and insurance pro-

---

1. This category refers to contributions which would qualify as "charitable" within the meaning of the Internal Revenue Code. *See* Jt. Stmnt. at ¶ 6,n.1.

2. This category refers to revenue derived from dividends and interest received as a result of investments made by the Church. *See id.* at ¶ 6,n. 2.

3. This category refers to any revenue derived from the coin-operated soda machine on the Church's premises, any fund raising events conducted by the Church, and any letter-writing campaigns or other special fund raising efforts conducted by the staff of the Church. *See id.* at ¶ 6,n. 3.

4. This category refers to credits from merchants, adjustments to reflect outstanding checks which never were negotiated, and income derived from meals served at the Church. *See id.* at ¶ 6,n. 4.

5. This category refers to revenue derived from the sale of securities owned by the Church. *See id.* at ¶ 6,n. 5.

6. This category refers to income derived from charitable contributions, received by the Church's Social Action Committee. *See id.* at ¶ 6,n. 6.

ceeds.[7] The following table reflects the amount of income attributable to each such category for the fiscal years in question:

| | June 1993-June 1994 | June 1994-June 1995 | June 1995-June 1996 |
|---|---|---|---|
| Rental Income | $ 467,912 | $ 481,427 | $ 451,973 |
| Contributions | 57,289 | 41,444 | 50,690 |
| Investment Income | 6,319 | 6,512 | 7,008 |
| Special Events | 12,087 | 8,511 | 9,069 |
| Miscellaneous | 3,024 | 6,718 | 2,406 |
| Gain on Investment Sales | 18,850 | (8,982) | (1,437) |
| Social Action Committee | 1,123 | 600 | 200 |
| Insurance Proceeds | | 15,520 | |

*See* Jt. Stmnt. at ¶¶ 5–10.

Limited information is available regarding the extent to which the Church segregated its charitable contributions from its business related income. The parties have stipulated that the Church placed the money it received from its rental activities, contributions and other sources of income into a single, unrestricted fund, and from that fund paid its employees' salaries and other expenses. *See id.* at ¶ 89. They have also stipulated that according to Board minutes dated November 30, 1994, the Board agreed to supplement Church employees' Christmas bonuses with money that was received in the Church's collection plate, so that the total bonus for such employees equaled $1,000. *See id.* at ¶ 87.

Plaintiff contends that while employed by the Church, he engaged in interstate commerce by virtue of both his purchases of goods from out-of-state vendors and his work with short and long-term tenants of the Church. Plaintiff commenced employment with the Church in 1990 as an Assistant Building Engineer and retained this position until the termination of his employment on May 14, 1997. *See id.* at ¶¶ 21–22. As Assistant Building Engineer, plaintiff's job responsibilities included, *inter alia*, custodial and maintenance work, assisting the Church's short and long-term tenants, and purchasing equipment, cleaning and maintenance supplies. *See id.* at ¶ 23. For a four month period during his employment, plaintiff temporarily assumed the vacant position of Building Engineer which included similar responsibilities. *See id.* at ¶ 39.

During times relevant to this litigation, plaintiff purchased custodial supplies and other equipment from five out-of-state vendors. *See id.* at ¶ 40. The majority of such purchases were for custodial supplies, but on separate occasions plaintiff also purchased a refrigerator, electronics equipment, and a computer from such vendors. *See id.* at ¶¶ 40–41, 44–46. Plaintiff also claims to have purchased materials from a supplier of plumbing parts from California, but cannot recall the name of the company and is unable to cite any purchases from out-of-state vendors other than those five indicated above. *See id.* at ¶¶ 40, 43–47.

In sum, the parties have stipulated that plaintiff made between one and four purchases from out-of state vendors in 1992; between three and six such purchases in 1993; between three and four such purchases in 1994; between one and four such purchases in 1995; between two and six such purchases in 1996; and between four and six such purchases from the beginning of 1997 through May 14, 1997, plaintiff's last day of employment with the Church. This results in a total of between fourteen and thirty such purchases between 1992 and 1997. *See id.* at ¶ 48.

Also as part of his regular duties, on an average of twice per month, plaintiff showed Church facilities to potential short-term tenants for special events like weddings and meetings, although he does not remember any particular party to whom he showed the facilities. *See id.* at ¶¶ 25–26. Plaintiff also worked directly with some short-term tenants to set up for their special events, both in advance and at the

---

7. This category refers to income derived from any claim made on an insurance policy. *See id.* at ¶ 8,n. 7.

time of their rentals, and at times suggested how such tenants might accomplish what they were trying to do. *See id.* at ¶ 27. In addition, plaintiff was generally available during special events to help in case any problems arose and to clean up after the event. *See id.* at ¶ 28. Plaintiff's work for two tenants deserves specific mention for the purposes of this litigation. Specifically, plaintiff performed custodial and maintenance tasks for the Winston Preparatory School ("Winston School") for his entire tenure with the Church, and custodial and "set-up"-related tasks for the National Broadcasting Company ("NBC"), in connection with its use of the Church as a control center during the broadcast of the 1997 Macy's Thanksgiving Day Parade. *See id.* at ¶¶ 16, 31.

Throughout his employment, plaintiff was paid an annual salary that did not vary according to the number of hours he worked. *See id.* at ¶ 50. Plaintiff's days and hours of work changed several times during the course of his employment, but throughout he had regularly scheduled hours and was expected to and did work additional hours. *See id.* at ¶¶ 50–58. At all such times, plaintiff received compensatory time for working excess hours rather than receiving any additional monetary compensation. *See id.* at ¶¶ 54, 60. The allocation of compensatory time to plaintiff was governed by a compensatory time policy articulated in the Church's personnel manual. *See id.* at ¶ 66.

The personnel manual provided that employees of the Church were entitled to straight compensatory time for work in excess of thirty-five hours per week if the employee obtained the prior approval of the Director of Management and Marketing or the Minister. *See id.* An employee could be credited for compensatory time without prior approval if the employee's supervisor approved the overtime and either an emergency existed or the supervisor submitted, post hoc, a written explanation of why additional hours were needed. *See id.* The personnel manual makes no mention of how compensation time will be treated at an employee's termination.

The Church kept no records of the number of hours plaintiff worked, and as a matter of Church policy, no full-time employees of the Church completed time sheets. *See id.* at ¶¶ 71–72. Since the beginning of 1993, however, plaintiff maintained records in which he made entries at the end of each Saturday and Sunday he worked, showing the times that he worked each day (the "Weekend Log"). *See id.* at ¶ 74. He also created a log showing the dates and times in which he worked at special events between August 3, 1994 and June 8, 1995 (the "Special Events Log"). *See id.* at ¶ 76. Finally, from April 1996 through May 14, 1997, plaintiff recorded his time in Day Timers, which plaintiff converted into a tabular format (the "Day Timers Tabulation"). *See id.* at ¶ 78.

Defendants have no documents that contradict the information contained in the Weekend Log, the Special Events Log or the Day Timers Tabulation. *See id.* at ¶¶ 75–77. While plaintiff did not always follow the procedures outlined above in obtaining compensatory time, plaintiff informed Fred Seidler, the Church's Director of Management and Marketing, of the amount of compensatory time that they owed during his employment. *See id.* at ¶ 69. The Church never denied credit for any such time. *See id.* at ¶ 70. Defendants do not contest plaintiff's time calculations (other than to indicate these figures do not reflect only that work actually performed in interstate commerce) and the parties have stipulated that plaintiff never used thirty-three compensatory days which accrued before February, 1993. *See id.* at ¶ 81.

Plaintiff suggests that certain evidence indicates that the Board knew its employees were potentially covered by the FSLA. In the Board's minutes of October 25, 1995, under the heading "Concerns of the Board," the following statement appears: "Overtime and compensatory time as it applies to hourly staff and to manage-

ment." *See id.* at ¶ 85. Furthermore, in 1996, Fred Seidler was warned by the Church's treasurer that the Church needed to limit its income producing activities so as not to exceed $500,000 per annum and jeopardize its 501(c)(3) status. *See id.* at ¶ 82.

## *DISCUSSION*

A court may grant summary judgment only if it determines that there are no genuine issues of material fact based on a review of the pleadings, answers to interrogatories, admissions on file and affidavits. *See* Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

When ruling on a summary judgment motion, a court must construe the facts in a light most favorable to the nonmoving party and must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). If no genuine issue as to any material fact exists, the moving party is entitled to summary judgment as a matter of law. *See Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

Interpretation of the FLSA is a federal question and determines the Court's jurisdiction over the current case. *See Griffin v. Daniel,* 768 F.Supp. 532, 533 (W.D.Va. 1991). The burden of proving jurisdictional prerequisites lies on the party who seeks the exercise of jurisdiction in his favor. *See Kheel v. Port of New York Authority,* 457 F.2d 46, 48 (2d Cir.1972)(citing *McNutt v. General Motors Acceptance Corp.,* 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135 (1936)), *cert. denied,* 409 U.S. 983, 93 S.Ct. 324, 34 L.Ed.2d 248 (1972). Accordingly, to both meet such jurisdictional prerequisites and prove he is entitled to overtime wages, plaintiff must demonstrate either that the Church was an "enterprise" subject to the requirements of the FLSA or, alternatively, that plaintiff was himself "engaged in commerce" as the FLSA defines these terms. *See* 29 U.S.C. § 207(a)(1)(1999).

## I. Enterprise Coverage under the FLSA

Under the enterprise theory of FLSA coverage, all non-exempt employees are covered by the protections of the FLSA if they are employed by an enterprise "engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and ... whose annual gross volume of sales made or business done is not less than $500,000." 29 U.S.C. § 203(s)(1)(A)(i,ii) (1999).

Enterprise coverage has been interpreted broadly by the courts. Under an "enterprise" application, the employee does not himself need to be involved in an activity that affects interstate commerce. *See Wirtz v. First National Bank & Trust Co.,* 365 F.2d 641, 645 (10th Cir.1966); *Archie v. Grand Central Partnership, Inc.,* 997 F.Supp. 504, 528 (S.D.N.Y.1998)(citing *Radulescu v. Moldowan,* 845 F.Supp. 1260 (N.D.Ill.1994)). Rather, if an enterprise meets the gross dollar volume amount, all employees are covered under the Act if some employees are (1) engaged in commerce; (2) engaged in the production of goods for commerce; or (3) engaged in handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce. *See Radulescu,* 845 F.Supp. at 1262.

The parties do not contest that the Church would be considered an enterprise engaged in commerce should it meet the gross dollar volume requirement. This Court agrees. Plaintiff's handling of janitorial goods that have moved in commerce and the Church's employment of several individuals involved in an extensive advertising campaign to solicit interstate special

event renters are more than sufficient to invoke enterprise coverage should the Church meet the FLSA's gross dollar volume requirement.

As noted in the factual discussion above, the Church's gross income for each fiscal year between 1994 and 1996 exceeds $500,000. Enterprise coverage will apply, however, only to the extent the business done by the relevant enterprise exceeds $500,000 for any of these years. *See* 29 U.S.C. § 203(s)(1)(A)(ii). Given its nonprofit charitable status, the Church generally would not be considered an "enterprise" under the Act. However, the Act is applicable to its activities insofar as they "serve the general public in competition with ordinary commercial enterprises." *Tony and Susan Alamo Found. v. Secretary of Labor,* 471 U.S. 290, 299, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985).

As the Church's rental activities are in direct competition with other short and long-term commercial landlords and special event locations, they are clearly commercial under the standard articulated by *Alamo* and its progeny. The Church's rental income alone, however, does not exceed the $500,000 threshold for enterprise coverage. Therefore, the Court must decide whether and to what extent the Church utilized moneys it received pursuant to its charitable function in the operation of its business.

The FLSA provides that the term "[e]nterprise" means "the related activities performed (either through unified operation or common control) by any person or persons for a common business purpose, and includes all such activities whether performed in one or more establishments or by one or more corporate or organizational units." 29 U.S.C. § 203(r) (1999). Activities are considered related when they are auxiliary or service activities such as central office and warehousing activities, or bookkeeping, auditing, purchasing, advertising, and other services. *See Archie,* 997 F.Supp. at 524 (citing 29 C.F.R. § 779.206(a)).

When different business entities are involved, the critical inquiry is whether there is "'operational interdependence in fact.'" *See id.* (citing *Donovan v. Easton Land & Dev., Inc.,* 723 F.2d 1549, 1551 (11th Cir.1984)). Entities which provide mutually supportive services to the substantial advantage of each entity are operationally interdependent and may be treated as a single enterprise under the Act. *See id.* (citing *Dole v. Odd Fellows Home Endowment Bd.,* 912 F.2d 689, 692–93 (4th Cir.1990)).

Plaintiff argues that aside from moneys received from contributions, all of defendants' sources of income should be included in the overall calculation of their gross volume of business done. *See* Memorandum of Law in Further Support of Plaintiff's Motion for Summary Judgment, dated December 13, 1997, at 7–8. Plaintiff argues that all income is commingled in one fund, and that money from the fund is used by the Church to support all of its operations, including the payment of employees and expenses related to its rental activities. Defendant counters that only the funds from the Church's rental activity should be calculated into the gross business done of the enterprise because it serves as the sole commercial business in which the Church is engaged.

At this time, the Court possesses an insufficient factual basis to grant summary judgment to either party with respect to the applicability of enterprise coverage. Undoubtedly, the Church's rental income and special events income should be included in the Church's gross business volume calculation. However, as these sums together do not surpass the $500,000 threshold, the Court must determine whether other sources of income, including charitable income, investment income, income from the gain on sale of investments, and miscellaneous income are sufficiently related to the Church's business income to warrant inclusion in the gross volume amount. As the parties have not present-

ed any information regarding, among other things, the purposes for which Church investments are made, the relation between miscellaneous income and the Church's operations, and the extent to which the Church, if at all, solicited contributions for the purpose of furthering its rental activities, summary judgment on this issue is not appropriate at this stage.

## II. Individual Coverage under the FLSA

Under individual or "traditional" coverage under the FLSA, an individual is covered by the Act if he has either "engaged in commerce" or "engaged in the production of goods for commerce." 29 U.S.C. § 207(a)(1) (1999). The parties agree that plaintiff did not participate in the production of goods for commerce, and that accordingly, FLSA individual coverage depends upon the extent to which he was "engaged in commerce." To be engaged in commerce, "a 'substantial part' of the employee's work must be related to interstate commerce." *Divins v. Hazeltine Electronics Corp.*, 163 F.2d 100, 103 (2d. Cir.1947)(quoting *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943)). Thus, under an individual theory of coverage, "[t]he test under this present act, . . . is not whether the employee's activities affect or indirectly relate to interstate commerce but whether they are actually in or so closely related to the movement of the commerce as to be a part of it." *McLeod v. Threlkeld*, 319 U.S. 491, 497, 63 S.Ct. 1248, 87 L.Ed. 1538 (1943).

Plaintiff contends initially that he has engaged in commerce by ordering cleaning supplies and equipment for the Church from out-of-state vendors by telephone and facsimile. Such purchases will be sufficient to invoke the protection of the FLSA unless they involve only "sporadic and occasional shipments of insubstantial amounts of goods." *See Mabee v. White Plains Pub. Co.*, 327 U.S. 178, 181, 66 S.Ct. 511, 90 L.Ed. 607 (1946); *Remmers v.*

*Egor*, 332 F.2d 103, 104 (2d Cir.1964). The legal standards are not clear as to when a shipment of goods is more than sporadic or occasional. In this Circuit, an employee that wrapped a single package for interstate mailing and on one occasion personally delivered a manufactured good across state lines was held not to be engaged in commerce under the FLSA. *Remmers*, 332 F.2d at 104 (*accord Parks v. Puckett*, 154 F.Supp. 842, 848–49 (W.D.Ark.1957)) (holding that plaintiff who signed nineteen receipts for interstate goods within a two year period and occasionally handled empty barrels, some of which were subsequently shipped in interstate commerce, did not engage in commerce). In the Fourth Circuit, however, an employee that received between eleven and twenty-three shipments from across state lines each month met the FLSA standard, despite spending only one-half hour per week on such tasks. *See Wirtz v. Durham Sandwich Company*, 367 F.2d 810, 812 (1966).

Here, plaintiff's purchases were made from five different vendors, and included not only custodial supplies but also other important items to the Church like a computer, electronic equipment and a refrigerator. *See* Jt. Stmnt. ¶¶ 40, 44–46. Additionally, as the parties have stipulated, documentary evidence produced in this case indicates plaintiff made between fourteen and thirty such purchases over the course of his employment. Moreover, beyond documentary evidence, the Church's Director of Management and Marketing has estimated that plaintiff made "dozens" of purchases from only one of these vendors, and that it was a "normal part" of plaintiff's duties to place orders with such vendors. *See id.* at ¶ 48.

 Such recurrent and frequent purchases of goods from out-of-state vendors is more than sufficient to trigger the protection of the FLSA. Clearly plaintiff's purchases in interstate commerce exceed the one delivery made across state lines by the plaintiff in *Remmers*. Such purchases obviously also constitute more interstate

activity than that which took place in *Parks*, where the plaintiff merely signed receipts for the goods received by defendant company when her supervisor was unavailable. 154 F.Supp. at 845, 848. Indeed, plaintiff's interstate activity at least parallels that which took place in *Wirtz*, and may even exceed it because plaintiff himself both *ordered* and received important goods from at least five vendors on a regular basis. Accordingly, such actions bring plaintiff within the protection of the FLSA, and plaintiff is entitled to summary judgment on this issue.[8]

### III. Damages

■ Under the FLSA, an employee is due back wages for two years from the filing of his action, unless the employer willfully violates the Act, in which case back wages are due for three years. 29 U.S.C. § 255(a) (1999). A violation is "willful" for the purposes of the Act's limitations provision "only if the employer violates or shows a reckless disregard for the provisions of the Act." *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1062 (2d Cir. 1988); *See also McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 139, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988). Willfulness cannot be found on the basis of mere negligence or "on a completely good faith but incorrect assumption that a pay plan complied with the FLSA in all respects." *McLaughlin*, 486 U.S. at 135, 108 S.Ct. 1677.

Similarly, an employer found to have violated the pay provisions of the Act shall be liable not only for "payment of wages lost," but also "an additional amount as liquidated damages," 29 U.S.C. § 216(b) (1999), unless:

> the employer shows . . . that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the [Act,

in which case] the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of the Act.

29 U.S.C. § 260 (1999).

Plaintiff contends that defendants' violation of the FLSA was willful and that such violation was not in good faith, making plaintiff eligible for both a three year damage limitations period and liquidated damages. In support of these contentions, plaintiff notes that the Board's minutes of October 25, 1995 contain the statement "Overtime and compensatory time as it applies to hourly staff and to management." under the heading "Concerns of the Board." *See* Jt. Stmnt. at ¶ 85. Furthermore, plaintiff contends that the Church's Director of Management and Marketing was warned by the Church's treasurer that the Church needed to limit its income producing activities so as not to exceed $500,-000 per annum and jeopardize its 501(c)(3) status. *See id.* at ¶ 82. Defendants contest such findings, arguing that mere concern for the hours worked by their employees and the corporation's status as a charitable institution do not indicate either bad faith or a willful disregard of the Act's provisions.

■ The Court cannot conclude based on the record presented that no rational juror could find either the requisite willfulness, bad faith or the lack of either of these elements. Therefore, summary judgment for either party on these issues cannot be granted. Defendants' statements regarding their concern about overtime worked by employees and their mention of the $500,000 figure in an arguably unrelated context do not as a matter of law provide the Court with the factual basis sufficient to make any findings as to defendants' intentions. Such issues are particularly complicated by the Court's inability

---

8. Given this determination that plaintiff meets the Act's standard for individual coverage, the Court need not address plaintiff's other contentions which he claims support such coverage.

to determine to what extent defendants segregated their charitable and business functions, a finding relevant to the probative value of defendants' beliefs regarding the applicability of the FLSA to their operations.

The parties are also in sharp disagreement over the proper method for calculating plaintiff's damages. Defendants argues that plaintiff is entitled to overtime compensation under the Act only for the weeks he actually performed work in interstate commerce. Plaintiff counters that he is entitled to overtime compensation for every week of overtime he worked because defendants did not keep records detailing the type of work that plaintiff performed.

■ The balance of authority indicates that plaintiff is entitled to additional payment under the Act whenever he worked overtime where, as here, defendants failed to keep records of the time he spent specifically working in interstate commerce:

> An employer who has not kept the records required by Section 11(c) of the Act cannot be heard to complain that there is no evidence of the precise amount of time worked in interstate commerce, including overtime so worked.

*Wirtz v. First State Abstract and Ins. Co.,* 362 F.2d 83, 88 (8th Cir.1966). *See also Crook v. Bryant,* 265 F.2d 541, 544 (4th Cir.1959) (noting that "[t]here is strong authority for the proposition that if an employee's duties are partly intrastate and partly interstate, his entire compensation must conform to the provisions of the statute"). Indeed, the only authority cited by defendant, a Department of Labor opinion,

expressly indicates that if an employer wishes to pay overtime to an employee only for duties performed in interstate commerce, "the *employer's records* must clearly show this delineation in duties performed and wages paid." *U.S. Dep't of Labor, Wage and Hour Div.,* Op. WH–230 (1993)(emphasis added).

Plaintiff and defendants also disagree over how much plaintiff should be paid for each hour of overtime, an argument that turns upon whether or not plaintiff agreed his hours would fluctuate from week to week. Under the Act, salaried employees who have agreed their hours will fluctuate each week are paid a different rate of overtime for hours worked above forty hours than salaried employees who have agreed to work a set number of hours each week.[9] If hours are to fluctuate, the employee's salary compensates him straight time for all hours worked, and he is thus entitled only to half-time (or one-half his hourly rate) for all hours worked in excess of forty hours per week. *See* 29 C.F.R. § 778.113 (1999). On the other hand, if an employee has agreed only to work a set number of hours in a week, his salary operates as straight time pay only for those hours that he has agreed to work and does not compensate him at all for hours worked in excess of that amount. Accordingly, he is entitled to (1) one-half of his regular rate of pay for any hours in excess of forty hours but less than the agreed upon amount; and (2) time and a half for any hours worked in excess of the agreed upon amount.[10] *See* 29 C.F.R. § 778.114(b) (1999).

---

9. The Act provides a specific formula for calculating a salaried employee's hourly rate of pay. If hours are to fluctuate, the hourly rate for each week is found by dividing the amount of pay per week by the number of hours actually worked that week. 29 C.F.R. § 778.114(b) (1999). If an employee agrees to work a set number of hours per week, the hourly rate for all weeks is found by dividing the amount of pay per week by the number of hours agreed upon. 29 C.F.R. § 778.114(a).

10. By way of illustration, an employee who has fluctuating hours that has an hourly rate of pay of $5.00 for a particular week and that works sixty-five hours that week is entitled to $2.50 beyond his salary for hours forty through sixty-five. On the other hand, an employee that has an hourly rate of $5.00 and agrees to work fifty-five hours a week but actually worked sixty-five hours is entitled to $2.50 per hour beyond his salary for hours forty through fifty-five and $7.50 per hour for all hours fifty-five through sixty-five.

Plaintiff contends that plaintiff and defendants agreed upon a set number of hours for plaintiff to work each time they renegotiated plaintiff's employment contract, entitling plaintiff to a more generous overtime calculation. Under defendants' view, the parties agreed only that plaintiff's hours would fluctuate each week, entitling plaintiff to significantly less overtime pay. There are, however, factual disputes that must be resolved to determine these issues.

■ With respect to plaintiff's employment between February 1993 and May 1995, plaintiff himself presents potentially conflicting facts, claiming in his deposition that his hours would vary, while presenting an affidavit that he agreed to work fifty-five hours per week. Deposition of Ralph Boekemeier, Exhibit B to Defendants' Notice of Motion, dated July 7, 1997 at ¶¶ 101–102; Affidavit of Ralph Boekemeier, dated July 18, 1997 at ¶¶ 34–36. Moreover, the parties have nothing to say about periods of plaintiff's employment outside the February 1993 to May 1995 window. Accordingly, given the existence of these factual issues, the Court is precluded from granting summary judgment as to the manner in which overtime pay should be calculated.

## IV. Plaintiff's Claims under State Law

■ Plaintiff also brings forth claims for breach of contract and quantum meruit under New York state law, alleging that plaintiff is entitled to the cash value of thirty-three days of compensatory time that he did not use while employed by defendant.[11] Both claims must be rejected. For a claim of breach of contract, "plaintiff must demonstrate the existence of a valid contract, its performance under the contract, defendants' breach of that contract, and damages caused by the breach." *Commonwealth Assoc. v. Palomar Med. Tech., Inc.*, No. 96–1868, 1997 WL 26723 at *1 (S.D.N.Y.1997). Plaintiff makes no allegation that his contract provided for the payment of unused compensatory time at the termination of his employment. Rather, plaintiff stipulates that he was subject to the provisions of the Church's personnel manual which includes a policy governing the payment of compensatory time and provides no indication that employees will be paid for unused compensatory time. *See* Jt. Stmnt. at ¶ 66. Under such circumstances, summary judgment for defendant on this claim is warranted. *See Dow v. Board of Trustees of the Farmingdale Public Library*, 75 A.D.2d 632, 633, 427 N.Y.S.2d 298 (2d Dept.1980) (holding that "when there was no provision authorizing the accumulation or subsequent liquidation of such time ... [there is] no support for a claim for overtime accumulat[ion].")

For a claim of quantum meruit, New York law requires a claimant to establish four elements: (1) the performance of services in good faith; (2) the acceptance of the services by the person to whom they are rendered; (3) an expectation of compensation therefor; and (4) the reasonable value of the services. *Longo v. Shore & Reich*, 25 F.3d 94, 98 (2d Cir.1994) (citations and quotations omitted). Again, this claim must be denied because plaintiff had no basis to expect under his contract or the Church's personnel manual that he would be paid for unused compensatory time. *See* Jt. Stmnt. at ¶ 66. This fact coupled with plaintiff's failure to make any allegation or provide this Court with any facts demonstrating plaintiff's reasonable belief that he would be paid for unused compensatory time also warrants summary judgment on this claim in favor of defendants.

11. While plaintiff's complaint presents no specific factual grounds for recovery on its breach of contract or quantum meruit claims, plaintiff's pleading opposing defendants' summary judgment motion suggests that the basis of each of these claims is defendants' failure to pay plaintiff for unused compensatory time at the conclusion of his employment. The Court will consider these claims under this premise. *See* Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, filed August 15, 1997 at 19–20.

## CONCLUSION

For all the foregoing reasons, the Court grants partial summary judgment to plaintiff, and partial summary judgment to defendants. A Pre–Trial Conference in this action shall be held on April 10, 2000 at 10:45 a.m. at 40 Centre Street at which time the parties shall discuss outstanding issues relating to damages.

It is **SO ORDERED.**

Robert TURLEY and Tyrone
Hamlette, Plaintiffs,

v.

Rudolph GIULIANI, in his official capacity as Mayor of the City of New York and in his individual capacity; Howard Safir, in his official capacity as Police Commissioner of the City of New York and in his individual capacity; Joel Miele, in his official capacity as Commissioner of the Department of Environmental Protection of the City of New York; Thomas Purtell and Diane O'Connor, in their official and individual capacities; and the City of New York, Defendants.

No. 99 Civ. 3381(SAS).

United States District Court,
S.D. New York.

Feb. 15, 2000.

**292**

Robert T. Perry, Brooklyn, New York, for Plaintiff.

Dana H. Biberman, Corporation Counsel for the City of New York, New York, NY, for Defendant.

### *OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiffs, Robert Turley and Tyrone Hamlette, are professional street musicians who perform in and around the Times Square area. They bring this action to vindicate their First Amendment right to play reasonably amplified music on the sidewalks and traffic islands which comprise Times Square. Plaintiffs have moved for a preliminary injunction enjoining and restraining the defendants (collectively, the "City") from: (1) enforcing a decibel ceiling of 85–dB(A)–at–10 feet; (2) specifying a decibel ceiling lower than 95–dB(A)–at–15 feet on their sound device permits; (3) charging plaintiffs with making "unreasonable noise" or exceeding the allowable decibel level based on arbitrary sound measurement practices; (4) impos-

ing restrictions on plaintiffs' amplified music from which corporate-sponsored amplified events are exempt; (5) favoring certain Fifth Avenue business entities in the processing and issuance of sound device permits for the area in front of Trump Plaza at 5th Avenue and 58th Street; and (6) granting such entities "sham" permits in order to limit plaintiffs' opportunities for sound device permits at that location. The first three demands are referred to as the "sound level demands" while the latter three demands are referred to as the "preferential treatment complaints." For the reasons that follow, plaintiffs' motion is granted in part and denied in part.

## I. Facts

### A. The Music

Plaintiffs are street musicians who earn their living by performing music on sidewalks and traffic islands in and near Times Square. Affidavit of Robert Turley in Support of Plaintiffs' Motion for a Preliminary Injunction, sworn to November 2, 1999 ("Turley Aff."), ¶ 2. Turley plays the electric bass and the TrebleBass, which is a combined electric bass and guitar, while Hamlette plays a portable drum kit. *Id.* Neither of Turley's instruments can be heard without a sound amplifier. *Id.* In order to earn a living, plaintiffs typically perform an eclectic mix of soul and jazz six to eight hours a day, five days a week. *Id.,* ¶ 3. They usually play at a volume of 95 dB(A)–at–15 feet, which they contend is just loud enough to be heard above the ambient noise. *Id.* In good weather, plaintiffs attract between 15 and 20 people who typically stand 15 to 20 feet away from them. *Id.*

### B. The City's Sound Device Permit Scheme

To obtain a sound device (amplification) permit, an applicant must apply at least five days prior to the proposed use to the police precinct covering the area in which the sound device is to be used. *See* N.Y.C. Admin. Code § 10–108(e). The applicant must state the exact time, date and location where he or she proposes to use a sound device. *Id.* Each sound device permit must specify the exact time, date and location where the sound device may be used. N.Y.C. Admin. Code § 10–108(f). Each sound device permit must specify the "maximum volume of sound which may be employed in [the] use or operation" of the sound device. *Id.*

Turley typically applies for at least one five-day permit at either Mid Town North Police Precinct ("MTN"), which serves Times Square and the vicinity above West 45th Street, or Mid Town South Police Precinct ("MTS"), which serves Times Square and the vicinity below West 45th Street. *Id.,* ¶ 5.

Prior to March 1998, both MTN and MTS specified a 75–dB(A)–at–6 feet decibel level. Declaration of Robert T. Perry, plaintiffs' attorney, in Support of Plaintiffs' Motion for a Preliminary Injunction, sworn to November 3, 1999 ("Perry Decl."), ¶ 6. In March of 1998, in response to earlier litigation brought by Turley contesting the 75–dB(A)–at–6 feet decibel level, MTN began specifying an 85–dB(A)–at–6 feet decibel ceiling on sound device permits. Turley Aff., ¶ 8. At about the same time, MTS began specifying an 85–dB(A)–at–10 feet decibel ceiling. *Id.* On July 31, 1999, MTN raised the decibel ceiling to 85–dB(A)–at–10 feet. *Id.,* ¶ 16. The Department of Environmental Protection ("DEP"), however, has adopted the permissive policy of not pursuing enforcement[1] unless the

---

1. Both the New York City Police Department ("NYPD") and the DEP have the authority to enforce the provisions of Admin. Code § 10–108. Declaration of Dana H. Biberman, defendants' attorney, in Opposition to Plaintiffs' Motion for a Preliminary Injunction, sworn to

December 16, 1999 ("Biberman Decl."), ¶ 7. Whenever the DEP receives a noise complaint, whether from the NYPD or directly from the public, it dispatches an inspector with a sound meter to determine whether further enforcement action is required. *See*

Affidavit of Robert Rasmussen, Inspector with the New York City DEP, sworn to December

ing *Turley v. New York City Police Dep't*, 988 F.Supp. 675, 679–80 (S.D.N.Y.1997) (*"Turley I"*), *aff'd. in part, rev'd in part*, 167 F.3d 757 (2d Cir.1999)).

## II. Discussion

### A. Standard for Preliminary Injunctive Relief

■ A preliminary injunction generally may not be issued unless the plaintiff demonstrates that it is necessary to prevent irreparable harm and either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in favor of the movant. *Polymer Tech. Corp. v. Mimran*, 37 F.3d 74, 77–78 (2d Cir.1994); *Blum v. Schlegel*, 18 F.3d 1005, 1010 (2d Cir.1994). However, when the "moving party seeks a preliminary injunction to stay government action taken in the public interest pursuant to a statutory or regulatory scheme," a preliminary injunction should only be granted if the movant meets the more rigorous "likelihood of success" standard. *Latino Officers Ass'n v. City of New York*, 196 F.3d 458, 462 (2d Cir.1999) (internal quotation marks and citations omitted).

Plaintiffs argue that because there are public interest concerns on both sides of this case, they may rely on the less rigorous "fair ground for litigation" standard. Plaintiffs cite *Time Warner Cable of New York City v. Bloomberg L.P.*, 118 F.3d 917, 923 (2d Cir.1997) in support of this proposition. However, in *Time Warner* plaintiff did not seek to enjoin the exercise of governmental regulatory authority. *Id.* at 923–24. Rather, plaintiff, a cable operator, sought to enjoin New York City from using channels reserved for public, educational or governmental ("PEG") purposes for two 24–hour news programs produced by commercial television pro-

13, 1999 ("Rasmussen Aff."), ¶ 3.